**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| AYLIN & RAMTIN, LLC, an | ) | |
| Illinois limited liability company, | ) | |
| | ) | |
| JOHN DOE, individually, | ) | |
| | ) | Case No.: |
| Plaintiffs, | ) | |
| | ) | Hon. Judge: |
| v. | ) | |
| | ) | Hon. Mag. Judge: |
| TODD BARNHARDT, individually, | ) | |
| | ) | |
| LMLC MANAGEMENT, LLC, a | ) | |
| Wisconsin limited liability company, | ) | |
| | ) | |
| LMLC FRANCHISING, LLC, a | ) | |
| Wisconsin limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AT LAW

Plaintiff Aylin & Ramtin, LLC ("Aylin & Ramtin") and Plaintiff John Doe ("John Doe") (collectively, "Plaintiffs"), by and through their attorneys, Kameli & Associates, P.C., for their Complaint against Defendants LMLC Management, LLC ("LMLC Management"), LMLC Franchising, LLC ("LMLC Franchising"), Mr. Todd Barnhardt ("Barnhardt") (collectively, "Defendants") state and allege as follows:

## INTRODUCTION

## PARTIES

1. Plaintiff Aylin & Ramtin is an Illinois limited liability company organized on April 26, 2017 to own child care center franchises under the Little Minds Learning Center system and proprietary marks located in Champaign, Illinois and Bloomington, Illinois.

1

2. Plaintiff John Doe is an Iranian national who is the sole member and owner of Aylin & Ramtin.

3. Defendant Barnhardt, upon information and belief, is a citizen of the State of Colorado, is the president and chief executive officer of LMLC Management and LMLC Franchising, and is the sole owner of LMLC Management and LMLC Franchising.

4. Defendant LMLC Management is a Wisconsin limited liability company with its principal place of business at 2400 Foxglove Way, Suite 4 in Hudson Wisconsin. LMLC Management engages in the management of Little Minds Learning Center franchises. LMLC Management currently manages both franchises owned by Aylin & Ramtin. LMLC Management is an affiliate of LMLC Franchising, and is wholly owned and controlled by Barnhardt.

5. Defendant LMLC Franchising is a Wisconsin limited liability company with its principal place of business at 2400 Foxglove Way, Suite 4 in Hudson Wisconsin. LMLC Franchising engages in the business of selling Little Minds Learning Center franchises nationwide including in the State of Illinois. LMLC Franchising sold the two franchises in Champaign, Illinois and Bloomington, Illinois to Aylin & Ramtin. LMLC Franchising is an affiliate of LMLC Management, and LMLC Franchising is wholly owned and controlled by Barnhardt.

## NATURE OF THE ACTION

6. This is an action against LMLC Management and Barnhardt for breach of contract, declaratory judgment, breach of fiduciary duty, negligent misrepresentation, and fraudulent misrepresentation under Illinois law. Plaintiffs seek contract rescission, monetary damages, and injunctive relief as remedies.

7. Plaintiffs also bring an action against LMLC Franchising and Barnhardt for violations of the Illinois Franchise Disclosure Act, negligent misrepresentation, and fraudulent

misrepresentation under Illinois law. Plaintiffs seek contract rescission and monetary damages as relief.

## JURISDICTION AND VENUE

8.   Plaintiffs restate and reallege paragraphs 1 through 5 with the same force and effect as if fully set forth herein.

9.   This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 as Aylin & Ramtin is an Illinois limited liability company, John Doe is an Iranian national, Defendants are citizens of the State of Wisconsin and the State of Colorado, and the amount in controversy exceeds $75,000.

10.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as the events and omissions giving rise to Plaintiffs' claims occurred in the Northern District of Illinois. The contracts under which Plaintiffs bring this action involve the sale and management of a franchise by Defendants within the State of Illinois, and the parties contractually stipulated that a federal court in the State of Illinois would have general jurisdiction.

## ALLEGATIONS OF FACT

### The Sale of the Franchises and Execution of the Operative Agreements

11.  On or about April 26, 2017, Aylin & Ramtin filed its Articles of Organization, on which Barnhardt was the registered agent, and the management of Aylin & Ramtin vested only in John Doe. From the filing of Aylin & Ramtin's articles of organization to now, Barnhardt was never a member of Aylin & Ramtin.

12.  On or about April 26, 2017, Aylin & Ramtin and LMLC Franchising entered into a franchise agreement, a copy of which is attached hereto as **Exhibit 1** ("Champaign Franchise Agreement"), for a Little Minds Learning Center franchise to be owned by Aylin & Ramtin and to be located in Champaign, Illinois ("Champaign Franchise").

13. On or about April 26, 2017, Aylin & Ramtin and LMLC Franchising entered into a franchise agreement, a copy of which is attached hereto as **Exhibit 2** ("Bloomington Franchise Agreement") (together with the Champaign Franchise Agreement, the "Franchise Agreements"), for a Little Minds Learning Center franchise to be owned by Aylin & Ramtin and to be located in Bloomington, Illinois ("Bloomington Franchise") (together with the Champaign Franchise, "Franchises").

14. On or about April 26, 2017, Aylin & Ramtin and LMLC Management entered into a management agreement, a copy of which is attached hereto as **Exhibit 3** ("Champaign Management Agreement"), pursuant to which LMLC Management would manage the Champaign Franchise on behalf of Aylin & Ramtin.

15. On or about April 26, 2017, Aylin & Ramtin and LMLC Management entered into a management agreement, a copy of which is attached hereto as **Exhibit 4** ("Bloomington Management Agreement") (together with the Champaign Management Agreement, "Management Agreements"), pursuant to which LMLC Management would manage the Bloomington Franchise on behalf of Aylin & Ramtin.

16. In conjunction with Franchise Agreements and the Management Agreements, LMLC Franchising and LMLC Management, at the direction of Barnhardt, issued a Franchise Disclosure Document ("FDD") and a business plan for the Franchises ("Business Plan") promoting the sale of the Franchises. A copy of the FDD is attached hereto as **Exhibit 5**. A copy of the Business Plan is attached hereto as **Exhibit 6.**

17. As an officer of LMLC Franchising and LMLC Management, Barnhardt exerts control over and directs the representations, sales, and operations of LMLC Franchising and LMLC Management.

4

18. Aylin & Ramtin and Defendants entered into the Franchise Agreements and the Management Agreements as John Doe wished to obtain United States lawful permanent residency through the EB-5 immigration investor visa program, also known as Employment Based Category 5, EB5 or EB-5 program ("EB-5 Program") as administered by the United States Citizenship and Immigration Service ("USCIS").

19. The EB-5 Program requires petitioners, such as John Doe, to enter into a business and investment venture in the United States which will create ten or more full-time jobs for United States workers, with a minimum required investment of five-hundred thousand dollars ($500,000.00) to one million dollars ($1,000,000.00), dependent upon the location the of business and investment venture.

20. Aylin & Ramtin was capitalized with four hundred and thirty thousand dollars ($430,000.00) ("Capital Contribution") by John Doe. The Capital Contribution was placed in the operating account of Aylin & Ramtin.

21. LMLC Management and Barnhardt have full control over the operating account of Aylin & Ramtin pursuant to a power of attorney executed by John Doe ("Power of Attorney").

22. In addition, the EB-5 Program requires that petitioners file a Form I-526 Immigrant Petition by Alien Entrepreneur ("Form I-526") with the USCIS. On May 16, 2017, John Doe, through his immigration counsel ("Immigration Counsel"), filed his Form I-526. In conjunction with retaining Immigration Counsel, John Doe mandated that LMLC Management and Barnhardt cooperate fully with Immigration Counsel.

23. The filing of a Form I-526 and supporting evidence represent the first step in the formal EB-5 process with the U.S. government. When the evidence submitted at the time of the filing does not establish eligibility, the USCIS routinely issue a Request For Evidence ("RFE")

stipulating certain issues and missing information with the filed Form I-526 which must be addressed.

24. If a petitioner resides outside of the U.S., the petitioner must submit the requested evidence no later than ninety-eight (98) days from the date of RFE. Petitioners must submit all requested evidence at one time. If a petitioner fails to respond by the deadline, USCIS may deny the petition.

25. Once John Doe receives lawful permanent residency, John Doe will take control of the Franchises.

26. Due to the difficulty of monitoring a business overseas, on or around June 11, 2017, John Doe designated MBM Plus, LLC ("MBM"), a Delaware limited liability company, as his designee for monitoring the activities of LMLC Management and Barnhardt. John Doe requested, in writing, LMLC Management and Barnhardt provide all information related to Aylin & Ramtin and the Franchises to MBM.

27. On or about April 9, 2018, without obtaining John Doe's nor MBM's permission, Barnhardt filed the annual report of 2018 for Aylin & Ramtin removing John Doe as the sole member having the authority of manager and adding himself as the only manager of Aylin & Ramtin.

**Requests for Documents**

28. In August and September of 2018, John Doe requested a conference call with Barnhardt to discuss the lack of documentation and information provided by LMLC Management and Barnhardt regarding the Franchises. Prior to such request, LMLC Management and Barnhardt had provided John Doe piecemeal and opaque documentation and information regarding the Franchises. John Doe also informed LMLC Management and Barnhardt that MBM and Immigration Counsel would

join the call. Though LMLC Management and Barnhardt made assurances that a conference call would take place, such a call between the parties has yet to take place.

29. On or about October 5, 2018, after failing to appear for a conference call, LMLC Management and Barnhardt emailed John Doe regarding an update of the Franchises and assured John Doe that hyperlinks sent every month contained reports covering the operations, human resources, financials and accounting, and sales and marketing of the Franchises were made available to John Doe for his review. However, when John Doe would attempt to access the hyperlinks, the hyperlinks were inaccessible or were often missing documentation and information. Never addressing the inaccessible hyperlinks or the missing documentation and information, LMLC Management and Barnhardt continued to assure John Doe that they would cooperate with Immigration Counsel to have John Doe's immigration petition successfully adjudicated.

30. On November 19, 2018, in anticipation of addressing the inevitable RFE, Immigration Counsel sought documents and information regarding the Franchises deemed necessary to respond to the RFE and which would be requested by the USCIS ("Necessary Documents") from LMLC Management and Barnhardt. Immigration Counsel set a deadline of December 3, 2018 for LMLC Management and Barnhardt to send the Necessary Documents.

31. On December 5, 2018, with the deadline set by Immigration Counsel passed, Immigration Counsel again requested the Necessary Documents. LMLC Management and Barnhardt refused to provide the Necessary Documents, claiming that there was no current RFE for John Doe.

32. On December 27, 2018, the USCIS issued a RFE stipulating certain issues and missing information with the filed Form I-526 which had to be addressed. The fixed deadline for the RFE was April 4, 2019.

33. On January 8, 2019, Immigration Counsel again informed LMLC Management and Barnhardt of the need for the Necessary Documents pursuant to the RFE then issued. On January 14, 2019, Immigration Counsel provided a detailed list of the documents needed to respond to the RFE. In response, LMLC Management and Barnhardt represented that they would provide Immigration Counsel with a timeline to prepare and provide the Necessary Documents within the next few days. No timeline was ever provided, and neither were the Necessary Documents.

34. On or around February 12, 2019, John Doe was informed of the fact that Immigration Counsel had not received any Necessary Documents. John Doe again requested LMLC Management and Barnhardt send the Necessary Documents to Immigration Counsel by February 20, 2019.

35. With no response from LMLC Management and Barnhardt, John Doe followed up again on March 9, 2019, and March 15, 2019 requesting LMLC Management and Barnhardt provide the Necessary Documents.

36. After four months, on March 18, 2019, LMLC Management and Barnhardt sent Immigration Counsel further hyperlinks allegedly containing the Necessary Documents. On the same day, LMLC Management and Barnhardt contacted John Doe. Rather than explain why it took LMLC Management and Barnhardt four months to provide information and documents that should have been readily available, LMLC Management and Barnhardt used the opportunity to demand further funds from John Doe; threatening to terminate the Management Agreements and Franchise Agreements, and default on the leases.

37. However, again, many of the hyperlinks provided were inaccessible. When the hyperlinks were accessible, the documents and information contained inside was insufficient to response to the RFE. On March 21, 2019, Immigration Counsel notified LMLC Management and Barnhardt

8

that the documents were insufficient, and again provided a detailed list of what documents were required.

38. On March 24, 2019, LMLC Management and Barnhardt assured Immigration Counsel that additional documents and information would be provided by March 29, 2019.

39. Despite the rapidly approaching deadline, LMLC Management and Barnhardt did not respond with additional documents and information until March 31, 2019; three days before the RFE was due. Even then, LMLC Management and Barnhardt provided a limited number of documents and information. The documents and information provided were still deficit per the needs of Immigration Counsel.

40. On April 3, 2019, Immigration Counsel responded to the RFE with the deficit documents and information provided. Immigration Counsel notified John Doe, LMLC Management, and Barnhardt of the deficit of the response to the RFE, and noted that the Necessary Documents were still needed in anticipation of the USCIS' attempt to deny John Doe's I-526 petition.

41. On or around April 10, 2019, LMLC Management and Barnhardt provided additional documents and information. The documents and information provided was once more defecit. However, among the documents provided, there were troubling indications regarding the status of the Franchises. For example, LMLC Management and Barnhardt provided pictures of the Franchises with the Little Minds logo and sign prominently displayed on the Franchises' respective buildings. However, upon further inspection, the Little Minds logo and sign was in fact photoshopped onto the buildings.

42. Without full and proper documentation, John Doe's Form I-526 may be denied by the USCIS. If his Form I-526 is denied, John Doe cannot receive lawful permanent residency through

the EB-5 Program. Achieving lawful permanent residency through the EB-5 Program is the reason the Franchises were purchased.

43. Despite their representations to Plaintiffs, LMLC Management's and Barnhardt's actions have led Plaintiffs to believe that they have no intention of ever providing Immigration Counsel with the proper and accurate documents and information necessary for John Doe's immigration proceeding. It was due to this belief that undersigned counsel was retained to investigate the actions of Defendants.

**Representations and Obligations Pursuant to the Management Agreements**

44. Pursuant to the Management Agreements, LMLC Management was appointed as Aylin & Ramtin's agent and representative in the management, operation, and maintenance of the Franchises. *Exhibit 3, Section 1 "Management and Operating Responsibility"*; *Exhibit 4, Section 1 "Management and Operating Responsibility"*.

45. As the president and chief executive officer of LMLC Management, Barnhardt made all decisions for, and asserted control over the management, operations, and maintenance of the Franchises.

46. LMLC Management and Barnhardt represented to Plaintiffs that LMLC Management would operate Aylin & Ramtin's Franchises in accordance with the Management Agreements on behalf of, and for the benefit of, Plaintiffs. As a result, Aylin & Ramtin, by John Doe, executed the Power of Attorney giving Defendants full control over the operating account for Aylin & Ramtin.

47. Driven by John Doe's desire to receive lawful permanent residency through the EB-5 Program, and relying upon LMLC Management's and Barnhardt's representations, Aylin &

Ramtin, through John Doe, made the Capital Contribution and executed the Management Agreements.

48. Upon execution of the Management Agreements, Aylin & Ramtin paid LMLC Management a total amount of forty thousand dollars ($40,000) as a management fee.

49. Pursuant to the Management Agreements, LMLC Management and Barnhardt represented that they have, and are contractually bound by, a fiduciary duty to Aylin & Ramtin regarding the management of the Franchises, the operating account of Aylin & Ramtin, and any profits earned by the Franchises. *Exhibit 3, Section 1.1 "Operating Authority"*; *Exhibit 4, Section 1.1 "Operating Authority"*.

50. LMLC Management and Barnhardt are bound not to take any action, or fail to take any action that harms Aylin & Ramtin's interests in the Franchises, Aylin & Ramtin's interest in its operating account, Aylin & Ramtin's interest in the profits earned from the Franchises, or the immigration petition of John Doe. *Exhibit 3, Section 1.1 "Operating Authority"*; *Exhibit 4, Section 1.1 "Operating Authority"*.

51. Pursuant to the Management Agreements, LMLC Management and Barnhardt represented that they will, and are contractually bound to, ensure that Aylin & Ramtin's operating account is not depleted, and LMLC Management and Barnhardt is bound to communicate the balance of Aylin & Ramtin's operating account to Plaintiffs. *Exhibit 3; Section 2.13*; *Exhibit 4; Section 2.13*.

52. Pursuant to the Management Agreement, LMLC Management and Barnhardt represented that they will, and are bound to, maintain the accounting and internal audit systems of Aylin & Ramtin in a reasonably acceptable manner, and establish and maintain complete, proper, current and accurate books and records for all transactions of the Franchises. *Exhibit 3, Section 2.15*; *Exhibit 4, Section 2.15*.

53. Pursuant to the Management Agreements, LMLC Management and Barnhardt represented that they will, and are contractually bound to, make timely payments to all suppliers, vendors, lenders, lessors, utilities, public services, and other indebtedness incurred by Aylin & Ramtin in the operation of the Franchises so as to maintain Aylin & Ramtin's good standing in regard to the aforementioned payments. *Exhibit 3; Section 2.10*; *Exhibit 4; Section 2.10*.

54. LMLC Management is bound to locate sites for the Franchises, negotiate leases for the Franchises on behalf of Aylin & Ramtin, purchase equipment for the Franchises on behalf of Aylin & Ramtin, and prepare the Franchises for operation. All in accordance with the Business Plan. *Exhibit 3; Section 2.6*; *Exhibit 4; Section 2.6*.

55. On or about April 26, 2017, LMLC Management and Barnhardt caused Aylin & Ramtin to enter into a lease agreement ("Champaign Lease"), a copy of which is attached hereto as **Exhibit 7**, with Green Street Realty Co. of Il., Inc. for the lease of a property located at 2301 Bradley Ave., Champaign, Illinois ("Champaign Property"). Pursuant to the Champaign Lease, Aylin & Ramtin is obligated to pay a security deposit in the amount of ten thousand eight hundred thirty-three and 33/100 dollars ($10,833.33) and first year rent in the amount of one hundred thirty thousand dollars ($130,000); half due upon execution and half due upon the receipt of a certificate of occupancy, and then certain amount as rent for subsequent years.

56. On or around January 1, 2018, while the Champaign Property landlord was prepared to tender possession, LMLC Management and Barnhardt failed to take possession of the Champaign Property. Payment of the security deposit and first year rent were made to Champaign Property landlord.  However, no other payment was ever made to the Champaign Property landlord for utilities, taxes, CAM charges, or other fees. Nor was any rent paid for the year of 2019.

57. As of April 29, 2019, a total amount of one hundred sixteen thousand three hundred ninety-eight and 12/100 dollars ($116,398.12) is due pursuant to the Champaign Lease. As of the date of this Complaint, LMLC Management and Barnhardt have not taken possession of the Champaign Property.

58. Ten months after the Champaign Property was tendered for posession, on October 5, 2018, in communication with John Doe, LMLC Management and Barnhardt reported that they and the director of Champaign Franchise were in the process of ordering equipment for the Champaign Franchise, and that a day care center license had been applied for. However, LMLC Management and Barnhardt made no mention of the mounting unpaid utilities, taxes, CAM charges or other fees nor the fact that LMLC Management and Barnhardt failed to communicate with the landlord or the fact they never took possession of the Champaign Property.

59. However, according to the documents and information provided by LMLC Management and Barnhardt there was no indication that any funds were expended for the purchase of equipment. Pursuant to the ledgers prepared by LMLC Management and Barnhardt, and provided to John Doe, for the months of September, October, and November the only charges recorded were for wages, bank charges, and software. As of the date of this Complaint, the Champaign Property sits devoid of any equipment.

60. On or around January 16, 2019, in communication with John Doe, LMLC Management and Barnhardt reported and assured John Doe that they were working with the local office of the Illinois Department of Children and Family Services ("Illinois DCFS") to adjudicate the child care center license application of the Champaign Franchise. However, no child care center license has ever been submitted to the Illinois DCFS.

61. No explanation was ever given as to the reason why LMLC Management and Barnhardt never took possession of the Champaign Property, never purchased equipment, or never applied for a child care center license with the Illinois DCFS. These facts had led Plaintiffs to believe that LMLC Management and Barnhardt have no intention of ever paying the outstanding rent due for the Champaign Property, of ever paying additional rent for the Champaign Property as it comes due, or of ever making the Champaign Franchise Operational. Their actions have led Plaintiffs believe that the Capital Contribution allocated for the development of the Champaign Franchise has been diverted for the benefit of entities and persons other than Aylin & Ramtin, John Doe, and Aylin & Ramtin's Franchises.

62. On or about April 27, 2017, LMLC Management and Barnhardt caused Aylin & Ramtin to enter into a lease agreement ("Bloomington Lease"), a copy of which is attached hereto as **Exhibit 8**, with Main and Veterans, LLC for the lease of a property located at 1716 R.T. Dunn Drive, Bloomington, Illinois, Unit 1 ("Bloomington Property"). Pursuant to the Bloomington Lease, Aylin & Ramtin is obligated to pay the first year rent in the amount of one hundred twenty thousand dollars ($120,000).

63. The Bloomington Property landlord tendered possession in February of 2018. The first-year rent prepayment was made on April 4, 2018. On or around April 5, 2018, an amendment to the Bloomington Lease was executed increasing the monthly rent owed by one thousand three hundred six and 88/100 dollars ($1,306.88) for sixty months. The first three payments of additional rent were made. However, no subsequent payment was ever made to the Bloomington Property landlord for rent, taxes, utilities, or CAM charges.

64. On or around October 5, 2018, in communication with John Doe, LMLC Management and Barnhardt represented that they were ordering equipment for the Bloomington Franchise and had

applied for a child care license with the Illinois DCFS. However, ledgers provided by LMLC Management and Barnhardt did not indicate the purchase of any equipment. Nor was any child care center license application for the Bloomington Franchise submitted to the Illinois DCFS.

65. On or around January 16, 2019, in communication with John Doe, LMLC Management and Barnhardt again assured John Doe that progress was being made in the marketing of the Franchises and in the adjudication of the child care license applications. Representing that the Franchises were ready to begin operations, LMLC Management and Barnhardt requested additional funding from John Doe. However, they were at a work stoppage because they have not received the rest of the funding. However, no equipment had been purchased for either franchise, only one employee was hired allegedly as the child care director for the Champaign Franchise, no child care license application were filed, and outstanding rent had begun to accrue.

66. On or about February 22, 2019, the Bloomington Property landlord sent LMLC Management and Barnhardt a five-day notice of default due to a lack of rent payments.

67. On or about April 1, 2019, the Bloomington Property landlord filed an eviction lawsuit. As of the date of this Complaint, seventy-five thousand seven hundred and 30/100 dollars ($75,700.30) is owed to Bloomington Property landlord. LMLC Management and Barnhardt, without obtaining Plaintiffs' prior permission, falsely portraying himself as the manager of Aylin & Ramtin hired an attorney to represent Aylin & Ramtin in the lawsuit.

68. No explanation was ever given as to the reason why the Franchises were not operational. This has led Plaintiffs to believe that LMLC Management and Barnhardt have no intention of ever paying the outstanding rent due for the Franchises' properties or of ever opening the Franchises. Their actions have led Plaintiffs to believe that the Capital Contribution allocated for the payment

of rent and equipment has been diverted for the benefit of entities and persons other than Aylin &

Ramtin, John Doe, and Aylin & Ramtin's Franchises.

69. Pursuant to the Management Agreements, LMLC Management and Barnhardt

represented that they would, and are contractually bound to establish and maintain complete,

proper, current and accurate records and books of account reflecting all transactions of the

Franchises. *Exhibit 3, Section 2.15*; *Exhibit 4, Section 2.15*. Such books and records are required

to be prepared on a cash basis, and otherwise in accordance with generally accepted accounting

principles. *Exhibit 3, Section 2.15*; *Exhibit 4, Section 2.15*.

70. LMLC Management and Barnhardt have yet to establish and maintain complete, proper,

current and accurate books and records reflecting all transactions of the Franchises. LMLC

Management and Barnhardt have only provided vague, edited bank statements, empty excel sheet

titled "transaction list," one single page profit and loss statement, and one single page balance

sheet, all of which do not stipulate where the Capital Contribution was spent.

71. After repeated requests from John Doe, MBM, and Immigration Counsel, LMLC

Management and Barnhardt provided invoices and other documents they claimed matched all

transactions reflected in the bank statements. Immigration Counsel attempted to match the invoices

and other documents provided to the transactions reflected in the bank statements. Many of the

transactions do not have corresponding invoices or other documents reflecting what the Capital

Contribution was spent on. Some of the invoices and other documents do not have corresponding

transactions reflected in the bank statements.

72. The documents provided by LMLC Management and Barnhardt continued to be inadequate

for purposes of responding to the RFE. Without full and proper documentation, John Doe's Form

I-526 may be denied by the USCIS. If his Form I-526 is denied, John Doe cannot receive lawful

permanent residency through the EB-5 Program. Achieving lawful permanent residency through the EB-5 Program is the reason the Franchises were purchased.

73. Based upon their actions, and despite their representations to Plaintiffs, Plaintiffs believe LMLC Management and Barnhardt have no intention of ever providing Immigration Counsel with the proper documents and information necessary to respond to the RFE. The opaque nature in which LMLC Management and Barnhardt maintain the books and records of the Franchises hide the fact that LMLC Management and Barnhardt have diverted the Capital Contribution for the benefit of entities and persons other than Aylin & Ramtin, John Doe, and Aylin & Ramtin's Franchises.

74. LMLC Management and Barnhardt continue to offer piecemeal and inadequate documents and information to Immigration Counsel to forever forestall John Doe's receipt of lawful permanent residency, and forever control the Franchises.

75. Pursuant to the Management Agreements, LMLC Management and Barnhardt represented that they would, and are contractually bound to, open the Franchises within twelve (12) months of the execution of the Management Agreements. *Exhibit 3; Section 2.22; Exhibit 4; Section 2.22*. The Franchises are considered open when children begin to attend the daycare centers. *Exhibit 3; Section 2.22*; *Exhibit 4; Section 2.22*. As of the date of this Complaint, neither Franchise has opened.

76. Pursuant to the Management Agreements, LMLC Management and Barnhardt represented that they would, and are contractually bound to, apply for process and take all steps reasonable necessary to maintain all licenses and permits required for the management, operation, and maintenance of the Franchises. *Exhibit 3, Section 2.3*; *Exhibit 4, Section 2.3*. Illinois law requires that all child care centers be licensed by the Illinois DCFS prior to operation unless an exemption

applies. *225 ILCS 10/3*. No exemption applies in this matter. As of the date of this Complaint, LMLC Management nor Barnhardt have yet to apply for a child care center license from the Illinois DCFS for both Franchises.

77. LMLC Management's and Barnhardt's failure to take possession of the Champaign Property and the Bloomington Property, their failure to pay rent as it came due, their evasive responses and opaque documentation, and their failure to apply for and receive the child care center licenses have led Plaintiffs to believe that LMLC Management and Barnhardt have no intention of ever opening the Franchises. Forever delaying the Franchises' opening and operation, LMLC Management and Barnhardt continue to divert funds away from Aylin & Ramtin's operating account for the benefit of entities and persons other than Aylin & Ramtin, John Doe, and Aylin & Ramtin's Franchises.

### Representations to Plaintiffs in the Sale of the Franchises

78.  In the FDD, LMLC Franchising represented that LMLC Management would operate the Franchises, and LMLC Franchising and LMLC Management would exert significant control over the Franchises. As a result of this level of control, LMLC Franchising represented to Plaintiffs that John Doe would not need to be physically present and involved in the day to day operation of the Franchises.

79. As Defendants were to exert a significant level of control over the Franchises, Defendants issued the Business Plan, in conjunction with the Franchise Agreements, the FDD, and the Management Agreements, stipulating how the Franchises would operate.

80. As the president and chief executive officer of LMLC Franchising and LMLC Management, Barnhardt was at the center of the relationship with Plaintiffs. From the sale of the Franchises to the current operation and control of the Franchises, Barnhardt, through his

companies, specifically targeted foreign investors with little to no experience in the United States and would be years away from immigrating to the United States.

81. In the Business Plan, issued in conjunction with the Franchise Agreements, the FDD, and the Management Agreements, LMLC Franchising and LMLC Management represented that by year two of the operation of the Franchises or within thirty-six months of the execution of the Management Agreements, the Franchises would have created a combined twenty-six full-time jobs. The Management Agreements represented that the Franchises would open within twelve months of the execution of the Management Agreement. This timeline was specifically designed to conform to the job creation requirements of the EB-5 Program, and thus attract those foreign investors looking to attain legal permanent residency in the United States.

82. The combined actions of the Defendants lead Plaintiffs to believe LMLC Franchising and LMLC Management never intended to create a combined twenty-six full-time jobs between the Franchises. As of the date of this Complaint, more than two years have passed since the execution of Management Agreements. Pursuant to the payroll record prepared by LMLC Management and Barnhart and submitted to John Doe, LMLC Management has claimed to have created one job, yet there has been no independent verification of this supposed job creation.

83. In the Business Plan, issued in conjunction with the Franchise Agreements, the FDD, and the Management Agreements, LMLC Franchising and LMLC Management represented that, within a year of Aylin & Ramtin's incorporation, the licenses and permits necessary to operate the Franchises in the State of Illinois would be obtained.

84. LMLC Management failed to apply for the child care center license necessary to operate both Franchises. As of the date of this Complaint, no child care license application has been submitted to the Illinois DCFS for either of the Franchises.

85. In the FDD, issued in conjunction with the Franchise Agreements, the Business Plan, and the Management Agreements, LMLC Franchising and LMLC Management represented that the Franchises would be operational within one year after the execution of the Franchise Agreements and the Management Agreements. However, as of the date of this Complaint, more than two year passed by the execution of the agreements and the Franchises are not operational.

86. In the Business Plan, issued in conjunction with the Franchise Agreements, the FDD, and the Management Agreements, LMLC Franchising and LMLC Management represented that in year one, Aylin & Ramtin would have a net profit of three hundred thirty-five thousand six hundred eighty dollars ($335,680). The same year, LMLC Franchising and LMLC Management represented that the Franchises would earn a total revenue of one million one thousand five hundred and thirty-five dollars ($1,001,535).

87. For year two, the Franchises would have a net profit of two hundred seventy-one thousand nine hundred fifty-one dollars ($271,951). The same year, LMLC Franchising and LMLC Management represented that the Franchises would earn a total revenue of one million seven hundred eleven thousand four hundred eighty dollars ($1,711,480).

88. For years three, four, and five, LMLC Franchising and LMLC Management represented that the Franchises would have a net profit of two hundred seventy-two thousand two hundred and eighty-six dollars ($272,286). The same years, LMLC Franchising and LMLC Management represented that the Franchises would earn a total revenue of one million nine hundred sixty-four thousand nine hundred sixty ($1,964,960).

89. Such financial projections were contingent on LMLC Management and Barnhardt taking possession of the child care center properties, purchasing all necessary equipment, supplies, and insurance, hiring all necessary staff, receiving the necessary licensing to operate from the Illinois

DCFS, and reaching capacity in terms of children served, all within a year. Such financial projections were not based upon prior operating experience or trends within the child care industry but rather by a desire to induce foreign investors who have little to no experience in the United States to pay hundreds of thousands of dollars with hopes of successful business and to achieve legal permanent residency in the United States. As detailed below, many other Little Minds child care centers owned and controlled by Barnhardt had been struggling financially prior to offering and selling the Franchises to Plaintiffs.

90. The Franchises will not achieve the level of revenue and profitability stipulated in the Business Plan. As of the date of this Complaint, the Champaign Property landlord has possession of the Champaign Property. The Bloomington Franchise are threatened with an eviction lawsuit.

91. Defendants' own admission, and as of February 2019, funds continue to be spent on child care centers that have yet to serve a single child.

92. The Franchises will not be serving any children in the foreseeable future. The State of Illinois requires that all child care centers, barring an exemption that does not apply in this matter, receive a child care license from the Illinois DCFS prior to being operational. *225 ILCS 10/3*. As of the date of this Complaint, no child care license has been applied for to operate the Franchises.

93. In order to apply for a child care license from the Illinois DCFS, an applicant must provide (attached to the application form): (i) the articles of incorporation and by-laws of the corporate entity to own the child care center; (ii) a statement of purposes and policies for staff and children under their care; (iii) a list of officers, board members and committees governing the corporate entity; (iv) the anticipated annual budget of the child care center; (v) the staffing plan for the child care center, including the job descriptions and qualifications of staff; (vi) written delegation of authority of those charged with maintaining compliance with licensing standards; (vii) a list of

staff, and consents, to conduct background checks; and (viii) radon and lead testing results for the child care facility (collectively, "Licensing Documents"). *Illinois DCFS Licensing Standards For Day Care Centers, Section 407.50.*

94. As of the date of this Complaint, the Licensing Documents have not been provided to the Illinois DCFS by the Defendants for both Franchises.

95. When Immigration Counsel requested that LMLC Management and Barnhardt provide a copy of the license applications they claimed were submitted, LMLC Management and Barnhardt simply provided the application forms, and not the Licensing Documents.

96. Once the Licensing Documents have been submitted to the Illinois DCFS, a temporary operational permit must be issued. In order for a child care center to receive a permit from the Illinois DCFS, the following must be achieved: (i) employment of a child care director (who passes a background check, meets licensing standards, and has submitted three references and proof of education); (ii) employment of staff that meet licensing standards; (iii) receipt of fire and sanitation clearances from Illinois DCFS; (iv) proof of liability insurance; (v) development of a medical emergency plan; (vi) development of a nutrition and food service plan; (vii) acquisition of necessary equipment and furnishings; (viii) records of staff (which include current medical reports, three character references, documentation of educational qualifications, and proof a cleared background check); (ix) creation of procedure and forms necessary to maintain licensing standards; (x) creation of a written plan as to how licensing requirements will be met; (xi) demonstration of financial capacity to operate a child care center; (xii) development of a child care program and daily schedule; (xiii) creation of the child care center's floorplan; (xiv) creation of a risk management plan; and (xv) creation of a statement of the child care center's discipline policy

(collectively, "Permit Requirements"). *Illinois DCFS Licensing Standards For Day Care Centers, Section 407.65.*

97. As of the date of this Complaint, the Franchises have not received a permit to operate as child care centers.

98. As of the date of this Complaint, the Bloomington Franchise does not currently employ a child care director despite LMLC Management and Barnhardt representations to the contrary. LMLC Management and Barnhardt have represented that the Champaign Franchise's director has been retained since August 2018, however there is no indication if this person actually exists or what work the child care director has done.

99. As of the date of this Complaint, no additional staff have been hired for the Franchises. As evidenced by the experiences of other Little Minds centers, staff routinely resigned, and centers close due to salaries not being paid.

100. As of the date of this Complaint, the Franchises have not received fire and sanitation clearances. There is no indication that the Franchises have been scheduled to for fire and sanitation inspection by the Illinois DCFS.

101. As of the date of this Complaint, the Franchises do not have liability insurance. There is no indicate that any attempt has been made to purchase liability insurance for the Franchises.

102. As of the date of this Complaint, the Franchises do not have a nutrition and food service plan, nor have the Franchises acquired the furnishings and equipment necessary to operate child care centers.

103. As of the date of this Complaint, the Franchises do not have a plan as to how they are to achieve licensing requirements and maintain licensing standards.

104. As of the date of this Complaint, a child care program, a risk management plan, and discipline policy have not been created for the Franchises.

105. The Franchises' ability to demonstrate the financial wherewithal to operate and to maintain child care centers is dubious considering the fact that the Franchises have failed to meet their lease and other requirements of the Illinois DCFS. Defendants' collective actions in this matter have led Plaintiffs to believe that Defendants have no intention to apply for child care licenses for the Franchises.

106. The inability to meet the minimum requirements to open and continuously operate a child care center in the State of Illinois is unsurprising in light of the reality of the Defendants' other child care centers.

107. The FDD disclosed LMLC Franchising's affiliation with several entities claiming to operate Little Minds Learning Center franchises. These entities include Little Minds Learning Center – River Falls, LLC, a Wisconsin limited liability company ("LMLC River Falls"), Little Minds Learning Center – Littleton, LLC, a Wisconsin limited liability company ("LMLC Littleton"), and Little Minds Learning Center – Chicago, LLC, a Wisconsin limited liability company ("LMLC Chicago").

108. LMLC River Falls is an entity created to own and operate a Little Minds Learning Center franchise in River Falls Wisconsin. LMLC River Falls' registered agent is LMLC Holdings, Inc. ("LMLC Holdings"). LMLC Holdings is a Wisconsin corporation, an affiliate of LMLC Franchising and LMLC Management, and is wholly owned and operated by Barnhardt. Upon knowledge and belief, LMLC River Falls is partly owned by Barnhardt.

109. On or about March 25, 2019, the employees of LMLC River Falls resigned en mass due to LMLC River Falls' repeated inability to pay their salaries. As of the filing of this Complaint, the

child care center that was operated by LMLC River Falls is no longer in operation. On or about March 12, 2019, an eviction lawsuit was filed against LMLC River Falls for a repeated failure to pay rent.

110.  LMLC Littleton is an entity created to own and operate a Little Minds Learning Center franchise in Littleton, Colorado. LMLC Holdings is the registered agent for LMLC Littleton. Upon knowledge and belief, LMLC Littleton is partly owned by Barnhardt.

111.  LMLC Littleton is no stranger to unlawful conduct. In the year 2016, the Colorado Department of Human Resources ("Colorado DHR") cited LMLC Littleton for repeated failures to maintain licensing standards. These repeated citations resulted an adverse licensing recommendation by the Colorado DHR and a six month settlement agreement.

112.  In 2017, LMLC Littleton was cited for several further licensing violations. This resulted LMLC Littleton's license being placed on probationary status. In 2018, LMLC Littleton was cited for even more licensing violations. These numerous and repeated licensing violations by LMLC Littleton culminated in the suspension by the Colorado DHR of LMLC Littleton's license to be operated a child care center. As of the date of this Complaint, LMLC Littleton child care center is not operational.

113.  LMLC Chicago is an entity created to own a Little Minds Learning Center franchise in Chicago, Illinois. Barnhardt is the registered agent for LMLC Chicago. Upon knowledge and belief, the child care center to be owned by LMLC Chicago was operated by LMLC Management and Barnhardt.

114.  As of the date of this Complaint, LMLC Chicago is not currently operational. LMLC Chicago was never operational and has yet to find a location for the child care center. This fact is at the center of a lawsuit brought by the owners of LMLC Chicago against Barnhardt.

115. Of the Little Minds Learning child care centers that are, or were, operational, many have been repeatedly cited for child care licensing violations by the applicable state authority. Former employees of these child care centers have posed numerous online critiques; lambasting, amongst other things, a lack of salary payments, repeated licensing violations, and a failure by Barnhardt and his associates to properly care for the children entrusted to the centers.

116. The Little Minds Learning child care centers in Hudson, Onalaska, and River Falls Wisconsin, partly owned by, and with their child care license held by, Barnhardt, have been repeatedly cited for numerous child care licensing violations by the Wisconsin Department of Children and Families.

117. The child care center in Hudson has been cited twenty-one times for licensing violations. The child care center in River Falls has been cited six times for licensing violations. The child care center in Onalaska has been cited seventy times for licensing violations. Many licensing violations stem from an inadequate level of staffing at the child care centers.

118. Out of the nineteen franchises sold in Illinois to participants in the EB-5 Program, only two have received a child care license and two had received a child care permit. All operational franchises are or were managed by LMLC Management and Barnhardt, and all have been repeatedly cited for licensing violations by the Illinois DCFS. As of the date of this Complaint, one of the licensed Illinois franchises has ceased operations and its child care license is in the process of being revoked, and the other licensed franchise's child care license is threatened to be revoked by the Illinois DCFS. One franchise with the child care permit has also ceased operations and has since lost its permit, and the other franchise's child care permit expired due to a rejection of its child care license.

## COUNT ONE – BREACH OF CONTRACT

### (Aylin & Ramtin against LMLC Management)

119.  Aylin & Ramtin realleges and restates paragraphs 11 through 77 with the same force and effect as if fully set forth herein.

120.  A complaint states a claim for breach of contract when it alleges: (i) the existence of a valid and enforceable contract; (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) a resultant injury to the plaintiff. *Babbitt Municipalities, Inc. v. Health Care Serv. Corp.* 2016 IL App (1st) 152662, P27 (2016).

121.  Contracts exist between LMLC Management and Aylin & Ramtin. These are the Management Agreements.

122.  Pursuant to the Management Agreements, Aylin & Ramtin performed by paying the initial management fee in the amount of forty thousand dollars ($40,000) for the Franchises and by making a Capital Contribution in the amount of four hundred and thirty thousand dollars ($430,000).

123.  LMLC Management repeatedly breached the Management Agreements by: (i) failing to pay rent due pursuant to the Champaign Lease and Bloomington Lease; (ii) failing to maintain complete, proper, current, and accurate books and records of all transactions for the Franchises, and deliver said books and records to Aylin & Ramtin, John Doe, and to Immigration Counsel when requested; (iii) failing to open the Franchises within a year of the execution of the Management Agreements; and (iv) failing to apply for, and successfully adjudicate, licenses for both Franchises.

124.  By its numerous breaches of the Management Agreements, LMLC Management damaged Aylin & Ramtin by: (i) causing Plaintiffs to incur mounting liabilities pursuant to the Champaign Lease and the Bloomington Lease; (ii) exposing Aylin & Ramtin to legal action by the

Bloomington Property landlords; (iii) endangering the immigration petition of John Doe; (iv) causing Aylin & Ramtin to incur a loss of over a year of revenue due to the fact that both Franchises have yet to be operational; and (v) causing a loss of John Doe's investment.

125. LMLC Management has had months, if not over a year, to cure the breaches of the Management Agreements, but it failed to do so.

## COUNT TWO – BREACH OF FIDUCIARY DUTY

### (Plaintiffs against LMLC Management and Barnhardt)

126. Plaintiffs reallege and restate paragraphs 11 through 77 with the same force and effect as if fully set forth herein.

127. A complaint states a claim for breach of fiduciary duty when it alleges: (i) that a fiduciary duty exists; (ii) that the fiduciary duty was breached; and (iii) that such breach proximately caused the injury of which the plaintiff complains. *Neade v. Portes*, 193 Ill. 2d 433, 444 (Ill. 2000).

128. Pursuant to the Management Agreements, LMLC Management and Barnhardt, as the president and chief executive officer of LMLC Management, are agents of Plaintiffs. As agents of Plaintiffs, LMLC Management and Barnhardt owe Plaintiffs a fiduciary duty to act for the benefit of Plaintiffs.

129. As agents for Plaintiffs, LMLC Management and Barnhardt owe a duty to Plaintiffs to perform the duties stipulated in the Management Agreements.

130. As agents for Plaintiffs, LMLC Management and Barnhardt owe a duty to Plaintiffs to cooperate with Immigration Counsel in responding to the RFE.

131. LMLC Management and Barnhardt repeatedly breached their fiduciary duty to Plaintiffs by: (i) failing to pay rent due pursuant to the Champaign Lease and the Bloomington Lease; (ii) by failing to open both Franchises; (iii) by failing to apply a child care license for both Franchises; (iv) by failing to provide correct and accurate information and documents regarding Aylin &

28

Ramtin to Plaintiffs and their designees despite repeated requests; and (v) by diverting fund to other entities and person other than Aylin & Ramtin, John Doe, and Aylin & Ramtin's Franchises.

132. LMLC Management and Barnhardt abused the authority Plaintiffs entrusted in them by removing John Doe as Aylin & Ramtin's manager and by adding Barnhardt as the only manager of Aylin & Ramtin with the Illinois Secretary of State without obtaining any express permission from Plaintiffs. LMLC Management and Barnhart then used the usurped power to hire attorney representing Aylin & Ramtin in the eviction lawsuit without notifying Plaintiffs or receiving prior authorization from Plaintiffs.

133. As a result of LMLC Management's and Barnhardt's repeated failure to uphold their fiduciary obligations under the Management Agreements, Plaintiffs have suffered unnecessary expenses, legal and financial liabilities, increased costs, and lost revenue.

## COUNT THREE – NEGLIGENT MISREPRESENTATION
### Management Agreements
### (Plaintiffs against LMLC Management and Barnhardt)

134. Plaintiffs reallege and restate paragraphs 11 through 118 with the same force and effect as if fully set forth herein.

135. A complaint states a claim for negligent misrepresentation when it alleges: (i) a false statement of material fact; (ii) the defendant's carelessness or negligence in ascertaining the truth of the statement; (iii) an intention to induce the plaintiff to act; (iv) reasonable reliance on the truth of the statement by the plaintiff; and (v) damage to the plaintiff resulting from this reliance. *First Mercury Ins. Co. v. Ciolino*, 2018 IL App (1st) 171532, P43.

136. Pursuant to the Management Agreements, LMLC Management and Barnhardt made numerous material factual representations to Plaintiffs.

137. The actions of LMLC Management and Barnhardt in this matter have led Plaintiffs to believe that LMLC Management and Barnhardt were negligent in determining the truth of the material representations they made to Plaintiffs.

138. As LMLC Management and Barnhardt stood to gain the Capital Contribution, LMLC Management and Barnhardt made such false factual representations without regard as to their veracity in an effort to induce Plaintiffs to purchase the Franchises, to retain LMLC Management and Barnhardt to manage the operations of the Franchises, and to control the operating account of Aylin & Ramtin.

139. Plaintiffs believed such false factual representations to be true, and acted upon such factual representations in the hope of John Doe achieving lawful permanent residency in the United States.

140. As a result, Plaintiffs have suffered unnecessary expenses, legal and financial liabilities, increased costs, lost revenue, and a loss of investment.

## IN THE ALTERNATIVE

## COUNT FOUR – FRAUDULENT MISREPRESENTATION

### Management Agreements

### (Plaintiffs against LMLC Management and Barnhardt)

141. Plaintiffs reallege and restate paragraphs 11 through 118 with the same force and effect as if fully set forth herein.

142. A complaint states a claim for fraudulent misrepresentation when it alleges: (i) a false statement of material fact; (ii) known or believed to be false by the party making it; (iii) intent to induce the other party to act; (iv) action by the other party in justifiable reliance on the truth of the statement; and (v) damage to the other party resulting from such reliance. *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (Ill. 1980).

143. Pursuant to the Management Agreements, LMLC Management and Barnhardt made numerous material factual representations to Plaintiffs.

144. The actions of the Defendants in this matter have led Plaintiffs to believe that these factual representations were false at the time they were made.

145. The actions of the Defendants in this matter have led Plaintiffs to believe that LMLC Management and Barnhardt made such factual representations knowing they were untrue.

146. As LMLC Management and Barnhardt stood to gain the Capital Contribution, LMLC Management and Barnhardt made such factual representations to induce Plaintiffs to purchase the Franchises, to retain LMLC Management and Barnhardt to manage the operation of the Franchises, and to control the operating account of Aylin & Ramtin.

147. Plaintiffs believed such factual representations to be true, and acted upon such false factual representations in the hope of John Doe achieving lawful permanent residency in the United States.

148. As a result, Plaintiffs have suffered unnecessary expenses, legal and financial liabilities, increased costs, lost revenue, and a loss of investment.

## COUNT FIVE – NEGLIGENT MISREPRESENTATION
### Franchise Agreements
### (Plaintiffs against LMLC Franchising and Barnhardt)

149. Plaintiffs reallege and restate paragraphs 11 through 118 with the same force and effect as if fully set forth herein.

150. A complaint states a claim for negligent misrepresentation when it alleges: (i) a false statement of material fact; (ii) the defendant's carelessness or negligence in ascertaining the truth of the statement; (iii) an intention to induce the plaintiff to act; (iv) reasonable reliance on the truth of the statement by the plaintiff; and (v) damage to the plaintiff resulting from this reliance. *First Mercury Ins. Co. v. Ciolino*, 2018 IL App (1st) 171532, P43.

151.  Pursuant to the Business Plan, the Franchise Agreements, and the FDD, LMLC Franchising and Barnhardt made numerous material factual representations to Plaintiffs.

152.  The actions of LMLC Franchising and Barnhardt in this matter have led Plaintiffs to believe that LMLC Franchising and Barnhardt were negligent in determining the truth of the material representations they made to Plaintiffs.

153.  As LMLC Franchising and Barnhardt stood to gain the Capital Contribution, LMLC Franchising and Barnhardt made such false factual representations without regard as to their veracity in an effort to induce Plaintiffs to purchase the Franchises, to retain LMLC Management and Barnhardt to manage the operations of the Franchises, and to control the operating account of Aylin & Ramtin.

154.  Plaintiffs believed such false factual representations to be true, and acted upon such factual representations in the hope of John Doe achieving lawful permanent residency in the United States.

155.  As a result, Plaintiffs have suffered unnecessary expenses, legal and financial liabilities, increased costs, lost revenue, and a loss of investment.

## IN THE ALTERNATIVE

## COUNT SIX – FRAUDULENT MISREPRESENTATION

### Franchise Agreements

### (Plaintiffs against LMLC Franchising and Barnhardt)

156.  Plaintiffs realleges and restates paragraphs 11 through 118 with the same force and effect as if fully set forth herein.

157.  A complaint states a claim for fraudulent misrepresentation when it alleges: (i) a false statement of material fact; (ii) known or believed to be false by the party making it; (iii) intent to induce the other party to act; (iv) action by the other party in justifiable reliance on the truth of the

statement; and (v) damage to the other party resulting from such reliance. *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (Ill. 1980).

158. Pursuant to the Business Plan, the Franchise Agreements, and FDD, LMLC Franchising and Barnhardt made numerous material factual representations to Plaintiffs.

159. The actions of LMLC Franchising and Barnhardt in this matter have led Plaintiffs to believe that these factual representations were false at the time they were made.

160. LMLC Franchising and Barnhardt made such factual representations knowing they were untrue.

161. As LMLC Franchising and Barnhardt stood to gain the Capital Contribution, LMLC Franchising and Barnhardt made such false factual representations in an effort to induce Plaintiffs to purchase the Franchises, to retain LMLC Management and Barnhardt to manage the operations of the Franchises, and to control the operating account of Aylin & Ramtin.

162. Plaintiffs believed such factual representations to be true, and acted upon such false factual representations in the hope of John Doe achieving lawful permanent residency in the United States.

163. As a result, Plaintiffs have suffered unnecessary expenses, legal and financial liabilities, increased costs, lost revenue, and a loss of investment.

## COUNT SEVEN – VIOLATION OF THE ILLINOIS FRANCHISE DISCLOSURE ACT
### (Plaintiffs against LMLC Franchising and LMLC Management)

164. Plaintiffs reallege and restate paragraphs 11 through 118 with the same force and effect as if fully set forth herein.

165. Under the Illinois Franchise Disclosure Act, it is unlawful for any person, in connection with the offer or sale of any franchise made in the State of Illinois, to directly or indirectly: (i) employ any device, scheme or artifice to defraud; (ii) make any untrue statement of a material face or omit to state a material fact necessary in order to make the statements made not misleading; or

(iii) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. *815 ILCS 705/6*.

166. Any person who offers, sells, terminates, or fails to renew a franchise in violation of the Illinois Franchise Disclosure Act shall be liable to the franchisee who may sue for damages caused thereby. *815 ILCS 705/26*.

167. LMLC Franchising and LMLC Management offered and sold Plaintiffs the Franchises.

168. In the offer and sale of the Franchises, LMLC Franchising and LMLC Management issued the Business Plan and FDD to Plaintiffs.

169. The Defendants' actions in this matter have led Plaintiffs to believe that the Business Plan, the Franchise Agreements, and the FDD contained numerous factual representations which are untrue.

170. As LMLC Franchising and LMLC Management stood to gain the Capital Contribution, LMLC Franchising and LMLC Management made such untrue factual representations in an effort to induce Plaintiffs to purchase the Franchises, to retain LMLC Management and Barnhardt to manage the operations of the Franchises, and to control the operating account of Aylin & Ramtin.

171. As their actions in this matter have shown, LMLC Franchising and LMLC Management had no intention of ever using, or were negligent in their use of, the Capital Contribution to establish and operate the Franchises for the benefit of Plaintiffs. Rather, LMLC Franchising and LMLC Management diverted funds from the operating account of Aylin & Ramtin for the benefit of entities and persons other than Aylin & Ramtin, John Doe, and Aylin & Ramtin's Franchises.

## COUNT EIGHT – CONTROL PERSON LIABILITY
### (Plaintiffs against Barnhardt)

172.  Plaintiffs reallege and restate paragraphs 11 through 118 and paragraphs 164 through 171 with the same force and effect as if fully set forth herein.

173.  Under the Illinois Franchise Disclosure Act, every person who directly or indirectly control a person liable under the Illinois Franchise Disclosure Act, every partner in a firm so liable, every principal executive officer of director of a corporation so liable, every manager of a limited liability company so liable, every person occupying a similar status or performing similar function, and every employee of a person so liable, who materially aids in the act or violation, is also liable jointly and severally with and to the same extent as such person. *815 ILCS 705/26.*

174. As the president and chief executive officer of LMLC Franchising and LMLC Management, Barnhardt has full control over and dictates the statements, representations, and operations of LMLC Franchising and LMLC Management.

175.  As Defendants' actions in this matter have shown, Barnhardt had no intention of ever using, or were negligent in the use of, the Capital Contribution to establish and operate the Franchises for the benefit of Plaintiffs. Rather, Barnhardt diverted funds from the operating account of Aylin & Ramtin for the benefit of entities and persons other than Aylin & Ramtin, John Doe, and Aylin & Ramtin's Franchises.

## COUNT NINE – DECLARATORY JUDGMENT
### (Plaintiffs against LMLC Franchising and LMLC Management)

176.  Plaintiffs reallege and restate paragraphs 11 through 118, paragraphs 141 through 148, and paragraphs 156 through 171 with the same force and effect as if fully set forth herein.

177.  Federal courts are empowered to declare the rights and legal relations of any interested party seeking such declaration whether or not further relief is sought. *28 U.S.C.S. § 2201.*

178. Pursuant to the Management Agreements, Aylin & Ramtin may terminate the Management Agreements upon LMLC Management's (i) failure to perform its duties and obligations pursuant to the Management Agreements; (ii) failure to comply with reporting or record keeping requirements of the Management Agreements; (iii) breach of the provisions of the Management Agreement; and (iv) engagement in any conduct that is detrimental or harmful to the name, goodwill, or reputation of Aylin & Ramtin. *Exhibit 3, Section 4.2(a), (c), (d), (e)*; *Exhibit 4, Section 4.2(a), (c), (d), (e)*.

179. LMLC Management repeatedly breached the Management Agreements by: (i) failing to pay rent due pursuant to the Champaign Lease and Bloomington Lease; (ii) failing to maintain complete, proper, current, and accurate books and records of all transactions for the Franchises, and deliver said books and records to Aylin & Ramtin , John Doe, and to Immigration Counsel when requested; (iii) failing to open the Franchises within a year of the execution of the Management Agreements; (iv) failing to apply for, and successfully adjudicate, licenses for both Franchises; and (v) breach of fiduciary duties.

180. Within its numerous breaches of the Management Agreements, LMLC Management damaged Aylin & Ramtin by: (i) causing Plaintiffs to incur mounting liabilities pursuant to the Champaign Lease and the Bloomington Lease; (ii) exposing Aylin & Ramtin to legal action by the Bloomington Property landlords; (iii) endangering the immigration petition of John Doe; (iv) causing  Aylin & Ramtin to incur a loss of over a year of revenue due to the fact that both Franchises has yet to be operational; and (v) causing a loss of John Doe's investment.

181. LMLC Management has had months, if not over a year, to cure the breaches of the Management Agreements.

182. A court may award rescission where there is material breach, fraud, or mutual agreement. *Newton v. Aitken*, 260 Ill. App. 3d 717, 719 (2nd Dist. 1994).

183. LMLC Franchising and LMLC Management, through Barnhardt, had engaged in actions and course of business which operate as a fraud upon Plaintiffs and a material breaches of the Management Agreements and the Franchise Agreements; they made numerous untrue representations of material facts in connection with the offer and sale of the Little Minds franchise and omitted to report several material facts to Plaintiffs.

184. Upon learning of Defendants' behavior, Plaintiffs filed this action alleging fraud and recession of the Franchise Agreements and Management Agreements.

## COUNT TEN – INJUNCTIVE RELIEF
### (Plaintiffs against all Defendants)

185. Plaintiffs restate and reallege all preceding paragraphs with the same force and effect as if fully set forth herein.

186. Defendants' have breached their contractual obligations, have breached their fiduciary duty to Plaintiffs, have been negligent in their duty of care to Plaintiffs, and have misrepresented material facts to Plaintiffs; all in an effort to induce Plaintiffs to purchase the Franchises, make the Capital Contribution, and to ultimately divert funds constituting the Capital Contribution for the benefit of entities and persons other than Plaintiffs and the Franchises.

187. Defendants' actions and conduct have caused and continue to cause irreparable harm to Plaintiffs as the Capital Contribution is depleted, and John Doe's Form I-526 is at risk of being rejected for an inability to fulfill the requirements of the EB-5 Program. A rejection of John Doe's Form I-526 endangers his ability to achieve lawful permanent residency in the United States.

188. Plaintiffs have no adequate remedy at law and are seeking a temporary and permanent injunction against Defendants preventing them from further harming Plaintiffs by depleting any

more of the Capital Contribution, and by withholding documents and information necessary to understand the financial health of Aylin & Ramtin and the Franchises and necessary to the successful adjudication of John Doe's immigration petition.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Aylin & Ramtin, LLC and Plaintiff John Doe respectfully request that this Honorable Court issue the following relief:

1. An order immediately enjoining Defendants from acting on behalf of Plaintiffs, or holding themselves out as acting on behalf of Plaintiffs;

2. An order immediately requiring Defendants to turn over control of Aylin & Ramtin's operating account to Plaintiffs' undersigned counsel;

3. Or, in the alternative, an order freezing Aylin & Ramtin's operating account for the pendency of this matter;

4. Immediately order an accounting of Plaintiffs' finances related to the purchase and operation of the Franchises;

5. An order immediately requiring Defendants to provide Plaintiffs' undersigned counsel with all documents regarding Plaintiffs and the Franchises in the possession of Defendants and in possession of those persons under the control of Defendants;

6. An order immediately requiring Defendants to provide Plaintiffs' undersigned counsel with all financial documents regarding Plaintiffs and the Franchises in the possession of Defendants and in possession of those persons under the control of Defendants;

7. Rescission of the Management Agreements;

8. Rescission the Franchise Agreements;

9. Rescission the Power of Attorney;

10. An order requiring Defendants to pay to Plaintiffs the entirety of the Capital Contribution, and any and all other amounts paid to Defendants pursuant to the Management Agreements and the Franchise Agreements;

11. An award of punitive damages not less than $500,000;

12. An order awarding attorneys' fees and costs;

13. An order granting any other relief this Honorable Court deems just and equitable.

Respectfully submitted,

**KAMELI & ASSOCIATES, P.C.**

/s/Taher Kameli/

Taher Kameli, Esq.

Ahmed Ammar, Esq.

Kameli & Associates, P.C.
Taher Kameli, Esq.
Ahmed Ammar, Esq.
1319 South State Street, Suite C-2
Chicago, Illinois 60605
Tele: (312) 233-1000
taher@kameli.com
aammar@kamelilawgroup.com
ARDC: 6237407
ARDC: 6323563

**Dated: May 21, 2019**