**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Aylin & Ramtin, LLC and John Doe, | |
| Plaintiffs, | |
| v. | Case No. 19 C 3402 |
| Todd Barnhardt, LMLC Franchising, LLC, and LMLC Management, LLC, | Hon. LaShonda A. Hunt |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Aylin & Ramtin, LLC ("A&R") and John Doe ("Doe") contracted with Defendants Todd Barnhardt ("Barnhardt"), LMLC Franchising, LLC ("LMLC-F"), and LMLC Management, LLC ("LMLC-M") to open two Little Minds Learning Center ("LMLC") childcare center franchises. If successful, Doe would become a lawful permanent resident of the United States under the EB-5 immigrant investor program, Defendants would expand LMLC with the use of outside capital, and all parties would profit from operating the business. Unfortunately, the enterprise failed, and Plaintiffs filed suit against Defendants to recover the investment and for other relief. Currently pending before the Court is Defendants' motion for summary judgment. For the following reasons, Defendants' motion [112] is granted in part and denied in part.

## JURISDICTION

Plaintiff A&R's sole member is Plaintiff Doe, an Iranian citizen. (Compl. ¶¶ 1-2, Dkt. No. 1). Defendant Barnhardt is a citizen of Wisconsin. (Citizenship Stmt. ¶ 3, Dkt. No. 43). The sole member of both LMLC-F and LMLC-M is non-party LMLC Holdings, Inc. ("LMLC-H"), which is a citizen of Wisconsin and Minnesota. (*Id.* ¶ 4). The complaint seeks damages in excess

of $930,000 and other relief. (Compl. ¶ 20 & Prayer for Relief). Accordingly, the Court has diversity jurisdiction under 28 U.S.C. § 1332.

## PROCEDURAL HISTORY

This case has an extensive procedural history. In response to Plaintiffs' complaint, Defendants filed an answer and five affirmative defenses, (Defs.' Ans., Dkt. No. 28), and LMLC-F and LMLC-M filed three counterclaims, (Defs.' Countercls., Dkt. No. 29), and a three-count third-party complaint, (Defs.' 3d-Party Compl., Dkt. No. 32).[1] Defendants later amended the answer to include nine affirmative defenses, (Defs.' Am. Ans., Dkt. No. 39), and the counterclaims were amended to include six counts (Defs.' Am. Countercls., Dkt. No. 38). Plaintiffs moved to strike all nine affirmative defenses, (Pls.' Mot. to Strike, Dkt. No. 77), but the Court allowed them to stand, striking only the language reserving the right to later assert more defenses (Mem. Op. & Order, Dkt. No. 98). Plaintiffs also filed a motion to strike and dismiss the counterclaims, (Pls.' Mot. to Strike & Dismiss, Dkt. No. 78), which the Court denied as to the first three counterclaims for breach of contract but granted as to the remaining three counts at Defendants' request, (Order, Dkt. No. 97). Finally, LMLC-F and LMLC-M sought to be dismissed from the action due to their bankruptcy filings, (Defs.' Mot. to Dismiss, Dkt. No. 85), but the Court denied that request, (Order, Dkt. No. 107). Thus, the following pleadings remain operative: Plaintiffs' Complaint, Counts One through Ten [1]; Defendants' Amended Answer and Affirmative Defenses One through Nine [39]; and LMLC-F and LMLC-M's Amended Counterclaims, Counts One through Three [38].

On May 13, 2022, Defendants filed the instant motion for summary judgment. The matter was fully briefed on July 1, 2022, and this case was reassigned to the undersigned District Judge

---

[1] There is no docket entry reflecting proof of service of the third-party complaint, and no appearance has been filed by a third-party defendant. Accordingly, the third-party complaint [34] is dismissed for failure to prosecute and complete service within the time-period required by Federal Rule of Civil Procedure 4(m).

on June 5, 2023. Having reviewed the docket, operative pleadings, summary judgment materials, and applicable law, the Court is now ready to rule.

## FACTUAL BACKGROUND

This section includes facts taken from Defendants' Statement of Facts, (Defs.' SOF, Dkt. No. 111), and Plaintiffs' Response to Defendants' Statement of Facts, (Pls.' SOF Resp., Dkt. No. 117).[2] Unless otherwise noted, all facts are undisputed. In resolving factual disputes, the Court strictly enforces the requirements of Local Rule 56.1. *Hanover Ins. Co. v. House Call Physicians of Ill.*, No. 15 C 3684, 2016 WL 1588507, at *2 (N.D. Ill. Apr. 19, 2016) ("[T]he Seventh Circuit repeatedly has held that the district court is within its discretion to enforce strict compliance with the requirements of Local Rule 56.1.") (collecting cases); *but see Jackson v. Bank of New York*, 62 F. Supp. 3d 802, 807 (N.D. Ill. 2014) ("[J]ust as the Court has the discretion to require strict compliance with the local rules, so too is it vested with the discretion to overlook transgressions of the local rules so long as it enforces or relaxes the rules equally as between the parties.") (citing *Modrowski v. Pigatto,* 712 F.3d 1166, 1169 (7th Cir. 2013)). Undisputed facts are treated as having been admitted. *Jackson*, 62 F. Supp. 3d at 807. Disputed facts that are supported by the record and not adequately controverted by the opposing party are accepted as true. *Hartford Fire Ins. Co. v. Taylor*, 903 F. Supp. 2d 623, 647 (N.D. Ill. 2012) ("When a proposed statement of fact is supported by the record and not adequately controverted by the opposing party, the Court will accept that statement as true. To adequately dispute a statement of fact, the opposing party must cite specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is

---

[2] The Supplemental Declaration of Todd A. Barnhardt in Support of Defendants' Motion for Summary Judgment, (Supp. Decl., Dkt. No. 121), is essentially a reply to Plaintiffs' Response to Defendants' Statement of Facts, which is prohibited by Local Rule 56.1(f) unless permitted by the Court. Because Defendants did not seek leave to file the declaration, it is stricken and will not be considered.

not sufficient to create a genuinely disputed issue of material fact.") (internal citation omitted); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("[D]istrict courts are not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact.'") (internal citation omitted).

LMLC was a childcare center business owned by LMLC-H, managed by LMLC-M, and franchised by LMLC-F. Barnhardt was the president and CEO of LMLC-H, the manager of both LMLC-M and LMLC-F, and a minority shareholder in LMLC-H. Only Barnhardt, LMLC-M, and LMLC-F are Defendants in this case, LMLC-H is not. Doe is an Iranian national, and the sole member of A&R, a limited liability company set up to own and invest in LMLC franchises.

In early 2015, Barnhardt learned of the opportunity to solicit foreign investments through the EB-5 Immigrant Investor Program to establish LMLC franchises. The EB-5 Program allows foreign investors to become lawful permanent residents of the United States by investing in commercial enterprises in the United States that meet certain criteria.[3] Essentially, under this program, foreigners who invested in LMLC franchises could then immigrate to the United States. In turn, LMLC-F would contract with an ownership entity created and owned by the investor to license the LMLC franchise, and LMLC-M would contract with the entity to establish and operate the franchise.

In connection with this opportunity, Barnhardt met businessman Foroud Sharegh ("Sharegh") and Attorney Taher Kameli ("Attorney Kameli"). Sharegh is in the business of brokering international franchise investment transactions. Attorney Kameli represents Plaintiffs in this action and appears to have provided input on the drafting of certain documents on behalf of

---

[3] U.S. Citizenship and Immigration Services (USCIS), EB-5 Immigrant Investor Program, https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program (last visited Jan. 13, 2024).

potential EB-5 investor clients.[4] These documents included certain statutory franchise disclosures, franchise and management contracts, and business plans.

By the end of October 2015, some of the franchise-related documents had been submitted to and approved for registration by the Illinois Attorney General, as required by Illinois law. *See* 815 ILCS 705/10. After LMLC received approval to offer franchises for sale, Sharegh began working as Defendants' employee, selling LMLC franchises to other investors. Eventually, Sharegh formed his own company to broker franchise deals with foreign investors. In connection with this endeavor, various marketing materials were created and provided to potential foreign investors.

In early April 2017, Doe became aware of the opportunity and decided to invest in two LMLC franchises in Bloomington, Illinois and Champaign, Illinois. Required disclosures were immediately provided, and the transaction proceeded quickly. The disclosures included information about fees, the estimated initial investment, the opening timeline, financial performance, anticipated timelines, expenses, financial performance, and other franchise locations, among other things. Within weeks, the parties had discussed initial funding and secured approval of anticipated franchise sites; Doe formed A&R to own the LMLC franchises; and legal documents including franchise agreements, management agreements, a power of attorney, and leases were drafted and exchanged.

On April 26, 2017, the franchise and management agreements and related documents were executed. Contract provisions relevant to the parties' dispute include the following:

---

[4] Defendants claim that Attorney Kameli and his firm "cooperated" with LMLC-F and LMLC-M to develop the materials necessary to sell franchises to EB-5 investors. Plaintiffs downplay Attorney Kameli's role, characterizing his involvement as "consulting" on franchise documents and EB-5 compliance, and "negotiating" certain contracts. Regardless of Attorney Kameli's role in creating the franchise materials, it is undisputed that independent, outside counsel represented Defendants in connection with drafting the documents.

1. **MANAGEMENT AND OPERATING RESPONSIBILITY**. [A&R] appoints [LMLC-M] as the agent and representative to supervise and direct, for and at the expense of [LMLC-M], the management, operation[,] and maintenance of the Business on the terms and conditions herein provided.

1.1 **OPERATING AUTHORITY**. [LMLC-M] shall have, full power, authority, discretion and control in all matters relating to the management, operation and maintenance of the Business, including . . . (b) the receipt, holding and disbursement of funds; (c) accounting; (d) budget; (e) maintenance of bank accounts; (f) procurement of inventories, supplies and services; . . . and (k) entering into such contracts, agreements and other undertakings as [LMLC-M] shall from time to time consider appropriate. [A&R] also entrusts [LMLC-M] with reasonable usage and management of funds placed in the Operating Capital Account . . . . *** [LMLC-M] is at all times bound by the fiduciary duty owed to the [A&R] in management of the School, the Operating Capital Account, and profits earned, and shall not take any action, enumerated or unenumerated, or fail to take any action specifically provided for within this Agreement that shall harm [A&R's] interests in the School or the Operating Capital Account or in profits earned . . . .

(*See* Barnhardt Dec., Ex. 66 (Bloomington Mgmt. Agmt.) §§ 1 & 1.1, Dkt. No. 111-4 at 22-23) (the Champaign Mgmt. Agmt. is the same for all practical purposes).

2. **SERVICES AND DUTIES OF MANAGER.** [LMLC-M] will perform all activities necessary or reasonably required to operate the Business. [LMLC-M] will:

***

2.13 Manage the Operating Capital Account such that the account is not depleted, and communicate with [A&R] regarding the balances of the operating account.

***

2.21 Any transaction over $5,000, excluding payroll, lease, or amount due to [A&R] or [LMLC-M] under the Franchise agreement and this Agreement, any amount due to a third-party approved by the [A&R] or its designee must be confirmed and approved by [A&R] or its designee. Notwithstanding this paragraph, any transaction over $15,000.00 must be approved by the [A&R] or its designee.

2.22 [LMLC-M] shall take all necessary steps in order to open the School in a timely manner, which shall be no longer than twelve

(12) months from the effective date of this Agreement. The opening shall be defined as the time when the doors have opened for children to begin attending the School. If the opening of the School is delayed for more than twelve (12) months, for each month of delay, [LMLC-M] shall credit the [A&R] an amount equal to one month's management fee and shall continue to not charge [A&R] any management fee, until such time that the School has been opened.

\*\*\*

(*See* Bloomington Mgmt. Agmt. §§ 2, 2.13, 2.21, 2.22, Dkt. No. 111-4 at 23-25).

5. **COMPENSATION.** As consideration for the services to be rendered by [LMLC-M] as set forth in this Agreement, [LMLC-M] agrees to the following:

5.1. Initial Management Fee- This fee is due and payable at the execution of this Management Agreement, [A&R] shall pay [LMLC-M] a management fee of $20,000 . . . ("Initial Management Fee"). This is a onetime fee which pays for school set up and launch as well as management of the first year of operation of School and which shall be non-refundable. This shall be paid according to a Capital Injection Schedule ("CIS") in the form attached hereto. The CIS shall be completed prior to, or at the time, this Agreement is executed.

\*\*\*

5.6. **OPERATING CAPITAL ACCOUNT.** [LMLC-M] shall maintain an account against which [LMLC-M] can issue checks (the 'Operating Capital Account'). Upon the execution of this Agreement, [A&R] will be required to place a sum of money into the Operating Capital Account. The total sum, to be made in installments according to the CIS which is to be completed prior to, or at the time, this Agreement is executed, in the amount of $230,000 . . . and shall be paid into the Operating Capital Account. These funds are to be used solely for franchise fee and business expenses according [to] the business plan accompanying this Agreement, subject to any future amendments to the business plan. Notwithstanding the forgoing, in any event, [A&R] agrees to maintain a balance in the Operating Capital Account sufficient to cover all the expenses related to the operation of the Business. If [A&R] is a foreign person applying for issuance of a visa through the Secretary of State or for an immigration benefit through USCIS, upon

> rejection, denial, or revocation of said application, [A&R] may withdraw all of funds from the Operating Capital Account upon Transfer of its interest in Franchise Agreement to an approved third party relationship entity.

(*See* Bloomington Mgmt. Agmt. §§ 5, 5.1, 5.6, Dkt. No. 111-4 at 29-30).

> **9.1. RELATIONSHIP OF FRANCHISEE AND MANAGER.** Everything done by [LMLC-M] shall be done as the agent and representative of [A&R], provided it is within the scope of authority granted herein. Neither party shall have the power to bind or obligate the other except as set forth in this Agreement, but [LMLC-M] shall have such additional authority and power as may be reasonably necessary to carry out the spirit and intent of this Agreement. ***

(*See* Bloomington Mgmt. Agmt. § 9.1, Dkt. No. 111-4 at 31).



**Capital Injection Schedule**

Franchisee hereby agrees to inject capital in the amount of the total required franchise and management capital injection, from approved sources, into the operating capital account, via electronic wire, in US Dollars, according to the following schedule:

|  | Amount | Date Deposited By |
| --- | --- | --- |
| Deposit 1: | 50,000 |  |
| Deposit 2: | 50,000 |  |
| Deposit 3: | 50,000 |  |
| Deposit 4: | 50,000 |  |
| Deposit 5: | 50,000 |  |

*Total by May 1, 2018*

(*See* Bloomington Mgmt. Agmt. at 12, Dkt. No. 111-4 at 33) (reflecting at total of $250,000 to be paid for each franchise by May 1, 2018).

> **4. FEES**
>
> A. You agree to pay us:
>
> > 1. Initial License Fee: An initial license fee of $20,000. The initial license fee, when paid, shall be deemed fully earned and nonrefundable. The initial license fee shall be due and payable at the execution of this Agreement.

(*See* Barnhardt Dec., Ex. 65 (Bloomington Franchise Agmt.) § 4.A.1., Dkt. No 111-4 at 8).

8

> [John Doe] [on] behalf of Aylin [&] Ramtin LLC ("Company")
> appoints LMLC Franchise [sic], [LMLC-M], Todd A Barnhart, and
> his delegates ("Agent"), . . . , as agent for Company to act in any
> lawful way pursuant to the Management Agreement between
> Company, and [LMLC-M] with respect to performing the powers
> listed below.

(Doe Dec., Ex. 9 (Power of Attorney), Dkt. No. 117-1 at 112).

After the contract documents were executed in April 2017, Plaintiffs deposited $100,000 in the Operating Capital Account for the projects. Of that initial deposit, a total of $80,000 was committed to up front franchise and management fees under the terms of the agreements. (*See* Bloomington Franchise Agmt.§ 4.A.1. ($20,000 franchise fee); Champaign Franchise Agmt.§ 4.A.1. ($20,000 franchise fee); Bloomington Mgmt. Agmt. § 5.1 ($20,000 management fee); Champaign Mgmt. Agmt. § 5.1 ($20,000 management fee)). Defendants then started working to open up the LMLC franchises, and the parties appear to have maintained regular communication through Sharegh and Attorney Kameli regarding project progress and funding requirements.

According to Defendants, their communications regularly expressed a dire situation caused by Plaintiffs' failure to timely and adequately and timely fund the franchises, which caused the landlords to be "up in arms" and the inability to pay franchise and management fees, prepay leases, purchase necessary equipment, hire necessary staff, and obtain licensure, among other things. Plaintiffs vehemently dispute this characterization and note that they contributed a total of $430,100 in capital by December 29, 2017. According to Plaintiffs, the relationship began to break down only when they discovered that their funds had not been used to purchase equipment and retain staff, but instead that Defendants had been "misappropriating" substantial sums from the A&R operating account to LMLC-M without authority. Specifically, Plaintiffs refer to the operating account bank statements for April 2017 to March 2018, which show that $233,550 was transferred from A&R's operating account to LMLC-M's bank account, $75,833.33 was paid to

9

the Champaign landlord, and only $450 was used for business expenses. Curiously, an account ledger prepared by Defendants showed only $80,000 (not $233,550) in transfers to LMLC-M's bank account for the same time period.

Defendants admit to having transferred the disputed funds and explain that the funds were "intercompany loans" used to pay for the expenses of other unrelated LMLC franchise projects. According to Defendants, they had authority to transfer and use the funds in this manner because the loans were necessary to keep the other franchise projects afloat, as the failure of those sites would negatively impact Plaintiffs' franchises. Plus, Defendants say that they repaid the intercompany loans, for the most part.

Despite these differences, Defendants continued working towards opening the Bloomington and Champaign LMLC franchise sites. Among other things, Defendants appear to have paid expenses such as utilities and wages of an employee and filed the LLC annual report for A&R, naming Barnhardt as both the registered agent and the manager of the entity. As of the filing of the complaint, however, Plaintiffs allege that neither franchise site would be operating as a childcare center in the foreseeable future. Plaintiffs allege that neither site had applied for the requisite licensure, the landlord took possession of the Champaign property, and the Bloomington property was under the threat of eviction. Subsequently, on November 20, 2019, all Defendants filed chapter 7 bankruptcy petitions. The bankruptcy cases of LMLC-F and LMLC-M were closed in July 2020 and in Barnhardt's case, he agreed to a voluntary waiver of discharge, which was approved by the bankruptcy court in November 2020. (Aug. 8, 2021 Minute Order, Dkt. No. 69).

## LEGAL STANDARDS

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court must resolve all disputed facts and draw all reasonable inferences in favor of the non-movant. *Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Cellotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 248 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Cellotex,* 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the (non-movant's) position will be insufficient; there must be evidence on which the jury could reasonably find for the (non-movant)." *Anderson,* 477 U.S. at 252.

## DISCUSSION

Defendants' motion seeks summary judgment on all ten counts of the complaint, some in their entirety and others as to certain parties only. The Court will address each count in turn.

### Count One – Breach of Contract
### (A&R v. LMLC-M)

In Count One of the Complaint, A&R claims that LMLC-M breached the management agreements for the Bloomington and Champaign franchise locations by failing to pay rent, maintain proper records, open the childcare centers within a year, and apply for the required licensing. LMLC-M seeks summary judgment on this count, arguing that A&R breached the agreements first by failing to provide timely funding. In response to LMLC-M's argument that A&R breached the agreements first, A&R responds with a different theory of breach than alleged in the complaint. It now claims that LMLC-M first breached the agreements in July 2017 by

transferring funds from the operating account to LMLC-M's account without authorization. In its reply brief, LMLC-M argues that A&R first breached the agreements on April 27, 2017, by failing to deposit $155,833.33 ($80,000 for franchise and management fees and the remaining amount for prepaid rent and a security deposit). Additionally, according to LMLC-M, the subsequent loans were "intercompany loans" that were partially repaid and authorized under sections 1.1 and 9.1 of the management agreements, which allowed it to enter "agreements and undertakings . . . [it] consider[ed] appropriate" and conferred "such additional authority and power that may be reasonably necessary to carry out the spirit and intent of [the agreements]." Finally, LMLC-M points to the power of attorney, which authorized it to "transfer money."

Under Illinois law,[5] "[t]he essential elements of a breach of contract are: (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) [a] resultant injury to the plaintiff." *Babbitt Mun., Inc. v. Health Care Serv. Corp.*, 2016 IL App (1st) 152662, ¶ 27 (quoting *Batson v. Oak Tree, Ltd.,* 2013 IL App (1st) 123071, ¶ 35). A plaintiff cannot prevail on a breach of contract claim, however, if the defendant shows that the plaintiff committed the first material breach. *See Kosuga v. Kelly*, 257 F.2d 48, 56 (7th Cir. 1958); *see also Fermaint v. Planet Home Lending, LLC*, No. 18 C 7325, 2023 WL 5227381, at *23 (N.D. Ill. Aug. 15, 2023); *Fireman's Fund Mortg. Corp. v. Zollicoffer*, 719 F. Supp. 650, 657 (N.D. Ill. 1989); *Daniggelis v. Pivan*, 159 Ill. App. 3d 1097, 1103 (1st Dist. 1987). The determination of whether a breach was "material" is generally considered a

---

[5] In diversity cases such as this, courts apply federal procedural law and state substantive law. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938). Contract law is treated as substantive. *Bourke v. Dun & Bradstreet,* 159 F.3d 1032, 1036 (7th Cir. 1998). Although the parties agreed that the management agreements (§ 9.9) would be "construed and interpreted" under Wisconsin law, they both cite Illinois law on breach, so it appears to be undisputed that that the law of the place where the contract was to be performed (i.e., Illinois) governs questions of breach. Thus, regardless of which state's law the agreements require to be applied in this instance, "[i]t is the parties' prerogative to ignore the [Wisconsin] choice of law clause in their [agreements] and consent to Illinois law, and the Court will honor that decision." *Pamado, Inc. v. Hedinger Brands, LLC*, 785 F. Supp. 2d 698, 705-06 (N.D. Ill. 2011).

"complicated question of fact[.]" *Pamado*, 785 F. Supp. 2d at 711 (quoting *William Blair and Co., LLC v. FI Liquidation Corp.,* 358 Ill. App. 3d 324, 346 (1st Dist. 2005)); *see also Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 594 (7th Cir. 2009) ("Although the interpretation of an established written contract is generally a question of law for the court, the question of whether or not a particular breach of a contract is material is a question of fact.") (internal citations omitted) (citing *Holmes v. Potter,* 552 F.3d 536, 538 (7th Cir. 2008)); *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.,* 353 F.3d 541, 544 (7th Cir. 2003).

Based on the parties' arguments, it is evident that there is a genuine dispute of material fact as to when the first material breach of the management agreements occurred. *Int'l Prod. Specialists*, 580 F.3d at 594 (materiality of breach is question of fact). LMLC-M claims that A&R breached by failing to provide timely initial funding on "day one" and in total by January 2018. A&R counters that LMLC-M breached first by making unauthorized transfers in July 2017. There is a question of fact as to whether the alleged breach on "day one" was material in light of LMLC-M's subsequent performance under the agreements. *See Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009) (finding sufficient evidence of waiver where party continued to accept payments under agreement); *Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.*, 719 F.2d 1335, 1343 (7th Cir. 1983) ("A party to the contract may waive a condition precedent to performance on his part or a breach of the contract provisions by conduct manifesting a continued recognition of the contract's existence after learning of the breach thereof, such as 'by continuing to accept performance of the contract and to have the benefit thereof.'") (quoting I.L.P. Contracts § 409 (1955)); *Royal Ornamental Iron, Inc. v. Devon Bank*, 32 Ill. App. 3d 101, 108 (1st Dist. 1975) ("delays in performance may be waived by conduct indicating an intention to regard the contract as still in force and effect.").

In addition, A&R has raised genuine disputes as to whether LMLC-M breached first in July 2017 and full funding of the contracts was not required until May 2018.[6] The parties' respective characterizations of the July 2017 transactions as "unauthorized transfers" and as "intercompany loans" could not be more different. There are several factual questions about those transactions that must be answered before it can be determined whether they were loans permitted under the agreements or transfers made without proper authority. As such, summary judgment on Count One for breach of contract against A&R is denied.

### Count Two – Breach of Fiduciary Duty
### (Plaintiffs v. LMLC-M and Barnhardt)

In Count Two of the Complaint, Plaintiffs claim that LMLC-M and Barnhardt breached fiduciary duties owed under the management agreements. Barnhardt moves for partial summary judgment on this count, arguing that a claim for breach of fiduciary duty cannot be asserted by or against the individual parties (i.e., by Doe or against Barnhardt). Specifically, Barnhardt asserts that the only fiduciary duties present in this case arise from the management agreements and are owed by LMLC-M, as manager, to A&R, as franchisee.

In order to prevail on a breach of fiduciary duty claim under Illinois law, a plaintiff must prove that: (i) a fiduciary duty exists; (ii) the duty was breached; and (iii) such breach proximately caused the plaintiff's injury. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000). Fiduciary relationships arise either as a matter of law or by special circumstances. *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006) (citing *Crichton v. Golden Rule Ins. Co.*, 358 Ill. App. 3d 1137, 1149 (5th Dist. 2005)). One source of a fiduciary duty that arises as a matter

---

[6] Although the question of whether full funding was due under the agreement by January or May 2018 is likely a matter of contract interpretation, it is not necessary to engage in that analysis because other disputes of fact compel the Court to deny LMLC-M's motion for summary judgment as to Count One.

of law is a principal-agent relationship, such as a power of attorney. *Ransom v. A.B. Dick Co.*, 289 Ill. App. 3d 663, 672 (1st Dist. 1997) (principal-agent relationship); *Lemp v. Hauptmann*, 170 Ill. App. 3d 753, 757 (5th Dist. 1988) (power of attorney). Fiduciary duties can also arise as a matter of law from statute. *See, e.g.*, 805 ILCS 180/15-3(g) (manager of LLC owes fiduciary duties to LLC and members). A fiduciary relationship "might also arise as a result of the special circumstances of the parties' relationship, where one party places trust in another so that the latter gains superiority and influence over the former." *Ransom*, 289 Ill. App. 3d at 672. To determine if such special circumstances exist, courts consider several factors, including "the extent to which the servient party entrusted his business affairs to the dominant party and placed trust and confidence in it." *Crichton,* 358 Ill. App. 3d at 1149. However, "the mere fact that business transactions occurred or that a contractual relationship existed is insufficient to warrant finding a fiduciary relationship." *R.J. Mgmt. Co. v. SRLB Dev. Corp.,* 346 Ill. App. 3d 957, 968 (2d Dist. 2004). The determination of whether a duty exists is a question of law. *Fulk v. Ill. Cent. R. Co.*, 22 F.3d 120, 125 (7th Cir. 1994).

As to the sources of the fiduciary duties owed by Barnhardt individually, Plaintiffs point to the power of attorney that named Barnhardt as agent in his individual capacity and the annual report for A&R that named Barnhardt as manager. In his reply, Barnhardt attempts to minimize having been appointed as power of attorney as a "mere convenience," referring back to the contract documents, which he says make clear that he was acting in a representative capacity. In addition, Barnhardt writes off having made himself the manager of A&R as part of a routine filing to maintain current registration for the entity.[7]

_____

[7] In his reply, Barnhardt also argues that, if there was a duty, he did not breach it. The Court will not entertain arguments made for the first time in a reply and therefore rejects Barnhardt's alternative theory that he did not breach

The parties seem to agree that the fiduciary duty arising from the management agreements runs from LMLC-M to A&R. Although Barnhardt would have the Court end its inquiry here and determine that he owed no duties because the agreements did not say so, he has failed to provide any authority to support that conclusion. While agreements are one potential source that could give rise to a fiduciary duty, there is no reason that they have to be the only source. Barnhardt cannot have it both ways—he cannot rely on the corporate formalities maintained in the management agreements while at the same time ignore such formalities (or lack thereof) in the power of attorney and annual LLC filing naming him in an individual capacity.

While the agreements expressly create a principal-agent relationship between A&R and LMLC-M Management, the power of attorney appoints "[LMLC-F], [LMLC-M], Todd A Barnhart, and his delegates" as agents with respect to the operating account. Whether drafted this way as a "mere convenience" or for other reasons, it is undisputed that the text of the document names Barnhardt individually. Although the power of attorney was executed as part of the overall transaction with and references the management agreements, it is a standalone document that gives rise to fiduciary duties as a matter of law. The fact that the management agreements contemplate appointing LMLC-M as power of attorney does not exclude the possibility of appointing additional parties as agents, which the power of attorney clearly does. If it were true that LMLC-M is the only agent by virtue of the management agreements, then there would have been no reason to include LMLC-F or Barnhardt's "delegates" as additional agents on the power of attorney. That argument also does not hold water because the management agreements create a principal-agent relationship with broad scope of authority, unlike the power of attorney, which covers the

---

a duty if one exists. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived.").

operating account only. Thus, whether the power of attorney is read alone or with the other contract documents, the document gives rise to a fiduciary duty owed by Barnhardt individually to A&R with respect to the operating account.

Furthermore, even if the power of attorney did not expressly provide that Barnhardt owed fiduciary duties to A&R, the fact that he was entrusted with control of hundreds of thousands of dollars in A&R's operating account constitutes special circumstances that likely give rise to a fiduciary duty in connection with handling the funds. Accordingly, Barnhardt's motion is denied as to the request for a determination that he did not owe any fiduciary duties as a matter of law.

As to Doe, however, the Court agrees that LMLC-M and Barnhardt did not owe Doe any fiduciary duties in his individual capacity. It appears undisputed that Doe's interactions with Defendants were all in his capacity as the sole member of A&R. Therefore, the only theory under which Doe would have been personally owed fiduciary duties would be if one of the Defendants was the duly appointed manager of A&R. If that were the case, the manager would have owed fiduciary duties to Doe, in his individual capacity as member of the entity. 805 ILCS 180/15-3(g)(2). Doe's only argument in this regard is that Barnhardt owed duties as manager after unilaterally entering his name as manager on an annual LLC filing. However, the procedural act of filling out one's name on an annual filing is not enough to become the actual manager of a limited liability company. *See* 805 ILCS 180/15-1(c)(3) "a manager . . . must be designated, appointed, elected, removed, or replaced by a vote, approval, or consent of a majority of the members; and . . . holds office until a successor has been elected and qualified, unless the manager sooner resigns or is removed." Because there is no allegation that any of the Defendants were duly made manager of the entity, Doe could not have been owed a fiduciary duty by them. For these

reasons, summary judgment on Count Two for breach of fiduciary duty is denied as to Barnhardt and granted as to Doe.

### Counts Three Through Six – Negligent & Fraudulent Misrepresentation (Plaintiffs v. Defendants)[8]

Counts Three through Six include claims for negligent or, alternatively, fraudulent misrepresentation. Essentially, Plaintiffs claim that Defendants either negligently or fraudulently made misrepresentations in the management and franchise agreements; the misrepresentations induced Plaintiffs to enter into the contracts with Defendants; and Plaintiffs relied on the misrepresentations to their detriment. Defendants seek summary judgment on these counts, arguing that the claims are barred under both the economic loss doctrine and Illinois' prohibition against promissory fraud actions.

Illinois law recognizes common law causes of action for both fraudulent and negligent misrepresentation. To establish a claim for fraudulent misrepresentation, a plaintiff must show a "(1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Soules v. Gen. Motors Corp.*, 79 Ill. 2d 282, 286 (1980). "[N]egligent misrepresentation 'has essentially the same elements [as a fraud claim], except that the defendant need not know that the statement is false; rather his own carelessness or negligence in ascertaining the truth of the statement will suffice.'" *First Mercury Ins. Co. v. Ciolino*, 2018 IL App (1st) 171532, ¶ 43 (quoting *Avon Hardware Co. v. Ace Hardware Corp.*, 2013 IL App (1st) 130750, ¶ 15). Thus, to prevail on a claim for negligent misrepresentation, a plaintiff must establish a "(1) a false statement of material fact;

---

[8] Counts Three and Four are for negligent and, alternatively, fraudulent misrepresentation against LMLC-M and Barnhardt, and Counts Five and Six are for the same alternative causes of action against LMLC-F and Barnhardt.

(2) defendant's carelessness or negligence in ascertaining the truth of the statement; (3) an intention to induce plaintiffs to act; (4) reasonable reliance on the truth of the statement by plaintiffs; and (5) damage to plaintiffs resulting from this reliance." *First Mercury*, 2018 IL App (1st) 171532, ¶ 43 (quoting *Phillips v. DePaul Univ.*, 2014 IL App (1st) 122817, ¶ 87).

As a general rule, Illinois law does not recognize actions for "promissory fraud"—i.e., a false statement of intent regarding future conduct, under a contract for example, rather than present or past facts. *Ault v. C.C. Servs., Inc.,* 232 Ill. App. 3d 269, 271 (3d Dist. 1992) ("[A]lleged misrepresentations must be statements of present or preexisting facts, and not statements of future intent or conduct."); *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 137 (7th Cir. 2011) ("[T]he fact that a party breaks a contract doesn't show that its promise to perform it had been fraudulent when made—that is, that the party had never intended to perform it."). However, there is an exception for misrepresentations that were made as part of a scheme to defraud. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009) ("[P]romissory fraud, i.e., a false statement of intent regarding future conduct rather than present or past facts, 'is generally not actionable under Illinois law unless the plaintiff also proves that the act was a part of a scheme to defraud.'") (quoting *Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007)). In this context, the Seventh Circuit has interpreted the word "scheme" to mean that "promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *Desnick v. Am. Broad. Co., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995).

Illinois law also limits actions for negligent and fraudulent misrepresentation based on a contract under the economic loss doctrine, which bars a plaintiff from recovering "for solely

economic loss in tort where the loss arises from the failure to perform contract obligations." *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 91-91 (1982) (describing the economic loss doctrine); *see also 2314 Lincoln Park West Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.,* 136 Ill. 2d 302, 307-09 (1990) (discussing *Moorman*); *Am. Xyrofin, Inc. v. Allis-Chalmers Corp.,* 230 Ill. App. 3d 662, 669 (2d Dist. 1992) (same). "There are several exceptions to this rule: (1) personal injury or property damage from a sudden or dangerous occurrence: (2) intentional fraud; and (3) negligent misrepresentation by a defendant that is in the business of supplying information for the guidance of others in their business transactions." *DriverDo LLC v. JP Morgan Chase Bank, N.A.*, No. 20 C 5046, 2021 WL 3487331, at *5 (N.D. Ill. Aug. 9, 2021) (citing *In re Chi. Flood Litig.*, 176 Ill. 2d 179, 199 (1997)). To qualify under the second exception, contractual damages are not enough, the plaintiff must also show that damages were proximately caused by fraudulent or intentional misrepresentations. *Clay Fin. LLC v. Mandell,* No. 16 C 11571, 2018 WL 4682339, *12 (N.D. Ill. Sept. 28, 2018). Under the third exception, "supplying of information need not encompass the enterprise's entire undertaking but must be central to the business transaction between the parties." *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18, 29 (1st Dist. 1999).

As an initial matter, Plaintiffs have failed to point to any evidence from which a reasonable jury could find that Defendants made any actionable misrepresentations *in the contract documents*. The contract terms characterized by Plaintiffs as misrepresentations concerning use of Defendant's capital contributions fall squarely into the category of promises of future conduct (as opposed to statements of past or present facts) that are not actionable because promissory fraud is not recognized under Illinois law. Furthermore, the "scheme to defraud" exception does not apply because Plaintiffs have not provided any evidence of particularly egregious behavior or a larger

20

pattern of deceptions or enticements that reasonably induced reliance. Indeed, Plaintiffs have not pointed to any evidence from which a reasonable jury could determine that Defendants either negligently or knowingly misrepresented information in the contract documents. Rather, Plaintiffs' arguments and evidence support their claims for breach of contract—Defendants made certain promises with respect to the use of funds in the operating account under the terms of the agreements, and the parties disagree about whether LMLC-M's actions complied with or departed from the terms. Thus, to the extent that Counts Three through Six are based on misrepresentations allegedly made in the contract documents, summary judgment is granted in Defendants' favor.

The Court's inquiry does not end there, however, because Defendants also allegedly made misrepresentations about use of funds throughout the parties' performance under the agreements. In this respect, the bar on actions for promissory fraud does not apply. To the extent that Defendants misrepresented the need for and usage of capital contributions in their communications with Plaintiffs, those were not promises of future conduct, but rather statements or omissions of present material facts. While the parties dispute both whether such statements constitute misrepresentations and whether Defendants knew or should have known the statements to be false at the time, those are issues to be determined by the finder of fact that the Court may not resolve on summary judgment.

Only the fraudulent misrepresentation claims are actionable, though, because the economic loss doctrine bars Plaintiffs from recovering alleged losses for negligent misrepresentation. None of the exceptions to the economic loss doctrine apply to the negligent misrepresentation claims, but the second exception for intentional misrepresentation applies to the fraudulent misrepresentation claims.[9] Specifically, the second exception for intentional misrepresentations

---

[9] The first exception for sudden, calamitous, or dangerous occurrences coupled with physical harm is inapplicable for all the misrepresentation claims.

applies to the claims for fraudulent but not negligent misrepresentation by definition. And the allegations of causation are sufficient to support damages caused by the supposed fraud as opposed to the contract damages. The third exception for information suppliers does not apply to either of the misrepresentation claims for several reasons. First, the information supplied (i.e., statements regarding the business plans, franchise disclosures, etc.) was provided in connection with contract formation, and the Court has already determined that such statements are not actionable under the bar against promissory fraud. Second, the misrepresentations allegedly made while the parties were performing under the contract are not in the nature of information being supplied for guidance of others. Finally, Defendants were in the business of selling and managing childcare centers, not in the business of supplying information for the guidance of others in their business transactions, and the central purpose of the transaction was to establish childcare franchises, not to exchange information. Accordingly, the economic loss doctrine bars Plaintiffs' claims for negligent misrepresentation but not for fraudulent misrepresentation.

In sum, the Court grants summary judgment in Defendants' favor on the negligent misrepresentation claims (Counts Three and Five) in their entirety and on the fraudulent misrepresentation claims (Counts Four and Six) as to the misrepresentations allegedly made in the contract documents. Counts Four and Six survive to the extent Plaintiffs argue that Defendants fraudulently misrepresented the need for and use of funds during performance of the contracts.

### Counts Seven & Eight –Franchise Disclosure Act Claims
### (Plaintiffs v. Defendants)

In Counts Seven and Eight of the Complaint, Plaintiffs sue Defendants for engaging in unlawful fraudulent practices under the Illinois Franchise Disclosure Act, 815 ILCS 705/1-44.

The Franchise Disclosure Act provides that, "[i]n connection with the offer or sale of any franchise . . . , it is unlawful for any person, directly or indirectly, to: (a) employ any device,

scheme, or artifice to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 815 ILCS 705/6. "Any person who offers, sells, terminates, or fails to renew a franchise in violation of this Act shall be liable to the franchisee who may sue for damages caused thereby." 815 ILCS 705/26. Furthermore, "[e]very person who directly or indirectly controls a person liable under this Section 26, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every manager of a limited liability company so liable, every person occupying a similar status or performing similar functions, and every employee of a person so liable, who materially aids in the act or transaction constituting the violation, is also liable jointly and severally with and to the same extent as such person, unless said person who otherwise is liable had no knowledge or reasonable basis to have knowledge of the facts, acts or transactions constituting the alleged violation." 815 ILCS 705/26.

The statute defines the word "sale" to "include every contract or agreement of sale of, contract to sell, or disposition of, a franchise or interest in a franchise for value." 815 ILCS 705/3(9). The word "offer" is defined to "include[] every attempt to offer to dispose of, or solicitation of an offer to buy, a franchise, any interest in a franchise or an option to acquire a franchise for value." 815 ILCS 705/3(12). For purposes of the statute's liability provision, 815 ILCS 705/26, the word "franchisee" includes "the personal representative or representatives of the franchisee." 815 ILCS 705/26.

As with other fraud-based claims, Illinois does not recognize claims for fraudulent practices under the Franchise Disclosure Act based on opinions or statements relating to future or

contingent events, such as future costs, sales, and profitability. *Bixby's Food Sys., Inc. v. McKay*, 193 F. Supp. 2d 1053, 1062 (N.D. Ill. 2002) (citing *Cont'l Bank, N.A. v. Meyer,* 10 F.3d 1293, 1298-99 (7th Cir. 1993); *Barrington Press, Inc. v. Morey,* 752 F.2d 307, 310 n. 1 (7th Cir. 1985)). And as discussed above, the alleged misrepresentations made in connection with contract formation fall into this category. Accordingly, they are not actionable under the Franchise Disclosure Act. In addition, because the statute expressly limits violations for fraudulent practices to unlawful conduct in connection with the offer or sale of a franchise, any fraudulent misrepresentations made while attempting to establish and operate the LMLC franchises subsequent to the initial offering and sale are also not actionable under the statute. Consequently, Plaintiffs cannot maintain their claims under the Franchise Disclosure Act, and the Court need not address the remaining arguments about negligent misrepresentations and individual "control person" liability under the statute. Summary judgment is granted in Defendants' favor on Counts Seven and Eight for Franchise Disclosure Act violations.

### Count Nine – Declaratory Judgment
### (Plaintiffs v. LMLC-F & LMLC-M)

Count Nine of the complaint is entitled "Declaratory Judgment", but it is unclear exactly what cause of action Plaintiffs intend to assert. While Paragraph 177 of the Complaint cites statutory authority for the Court to declare the rights and legal relations of parties, Paragraph 182 cites authority for the Court to order recission of a contract. To the extent that Count Nine seeks a declaration of the parties' rights and relations as to the contract, it is duplicative and unnecessary. If Plaintiffs prevail on their breach of contract claim, the judgment entered will act as a declaration as to the parties' rights and relations under the contracts. Defendants are also entitled to judgment as a matter of law on Count Nine to the extent that it requests recission. It is undisputed that both parties have performed extensively under the contracts, with the Plaintiffs making significant

capital contributions, and Defendants working to open two new franchise locations. Under these circumstances, a return to the status quo before the contracts were executed is impossible and an award of damages, not recission, would be the appropriate remedy. *Newton v. Aitken*, 260 Ill. App. 3d 717, 719 (1994) ("A court will not grant rescission of a contract where the status quo *ante* cannot be restored").

**Count Ten – Injunctive Relief**
**(Plaintiffs v. Defendants)**

Plaintiffs concede that they are no longer seeking injunctive relief. Accordingly, Defendants motion is granted as to Count Ten.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment [112] is granted in part and denied in part as follows. Summary judgment is denied on Count One (breach of contract); granted on Count Two (breach of fiduciary duty) as to Plaintiff Doe and denied as to Defendant Barnhardt; granted on Counts Three and Five (negligent misrepresentation); granted in part as to the contract document misrepresentations and denied in part as to the contract performance misrepresentations on Counts Four and Six (fraudulent misrepresentation); and granted on Counts Seven and Eight (Franchise Disclosure Act), Nine (declaratory judgment), and Ten (injunctive relief). Defendants/Third-Party Plaintiffs LMLC-F and LMLC-M's third-party complaint [34] is dismissed without prejudice.

**DATED**: January 29, 2024                    **ENTERED**:

LaShonda A. Hunt
United States District Judge