**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AYLIN & RAMTIN, LLC, and ALI AKBAR KASHI, | |
| Plaintiffs, | |
| v. | Case No. 19 C 3402 |
| TODD BARNHARDT, LMLC FRANCHISING, LLC, and LMLC MANAGEMENT, LLC, | Hon. LaShonda A. Hunt |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Aylin & Ramtin, LLC ("A&R") and Ali Akbar Kashi ("Kashi") sued Defendants Todd Barnhardt ("Barnhardt"), LMLC Franchising, LLC ("LMLC-F"), and LMLC Management, LLC ("LMLC-M") for claims arising from a failed enterprise to establish childcare center franchise locations under the name Little Minds Learning Center ("LMLC"). This case proceeded to a bench trial on November 12, 13, and 14, 2024. Having now considered the testimony, admitted evidence, arguments of the parties, and relevant case law, the Court enters a verdict in favor of Plaintiffs A&R and Kashi and against Defendants Barnhardt and LMLC-M and awards total damages in the amount of $114,960.90.[1] This decision sets forth the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

---

[1] The docket incorrectly reflects that Defendants LMLC-M and LMLC-F were terminated as parties as of 1/29/24. But the Court's prior minute order stated that only their third-party complaint was being dismissed without prejudice. (Dkt. 128). Therefore, only the third-party plaintiff and third-party defendants should have been terminated as parties. The Clerk is thus directed to update the docket to reflect that: (1) defendants LMLC Franchising, LLC and LMLC Management, LLC remain active parties; (2) counterclaimants LMLC Franchising, LLC and LMLC Management, LLC remain active parties; and (3) third-party defendants MBM Plus LLC, Foroud Sharegh, and Sepideh Noekhah are terminated as parties in accordance with the Memorandum Opinion and Order dated January 29, 2024 (Dkt. 129).

## PROCEDURAL BACKGROUND

The Court presumes familiarity with the procedural history of this case, as explained in the Memorandum Opinion and Order dated January 29, 2024 resolving Defendants' motion for summary judgment. (Mem. Op. & Order at 2-3, Dkt. 129).

After the summary judgment decision, the following pleadings remained operative for trial:

- **Plaintiffs' Complaint**:

  o Count I – Breach of Contract (A&R v. LMLC-M);
  o Count II – Breach of Fiduciary Duty (A&R v. Barnhardt & LMLC-M);
  o Count IV – Fraudulent Misrepresentation (Plaintiffs v. Barnhardt & LMLC-M); and
  o Count VI – Fraudulent Misrepresentation (Plaintiffs v. Barnhardt & LMLC-F).[2]

  (Compl., Dkt. 1).

- **Defendants' Affirmative Defenses ("ADs")**:

  o AD 1 – Contractual Disclaimer & Assumption of Risk;
  o AD 2 – Supervening or Intervening Cause (MBM Plus, LLC Non-Performance);
  o AD 3 – Failure to Join (MBM Plus, LLC);
  o AD 4 – Breach by Plaintiffs (Kashi and Barnhardt);
  o AD 5 – Failure to State a Claim;
  o AD 6 – Lack of Privity;
  o AD 7 – Duress (Untimely Capital Contributions);
  o AD 8 – Failure to Mitigate Damages; and
  o AD 9 – Supervening Cause (Actions of MBM Plus, LLC and Attorney Kameli).

  (Am. Ans. & ADs to Compl., Dkt. 39).

In addition, Defendants/Counter-Plaintiffs LMLC-M and LMLC-F's amended counterclaims against A&R for breach of contract, (Am. Countercl., Dkt. 38), and Plaintiff/Counter-Defendant A&R's affirmative defenses, (Ans. & ADs to Am. Countercl., Dkt. 105), remained pending. At the final pretrial conference held on November 5, 2024, though,

---

[2] The Court granted partial summary judgment to Defendants on the fraudulent misrepresentation claims but only to the extent the claims were based on misrepresentations *in* the contract documents. (Mem. Op. & Order at 21). Summary judgment was denied to the extent the claims were based on misrepresentations made *during* contract performance. (*Id.* at 21-22).

Defendants/Counter-Plaintiffs stated that they were asserting the counterclaims as offsets against Plaintiffs' claims and had basically forgotten about them.

During the three-day bench trial, the Court heard testimony from (1) Angelica Bermejo, a former paralegal/current office manager employed by the law firm of Kameli Law, P.C., the firm of Plaintiffs' counsel, Taher Kameli; (2) Foroud Sharegh, a businessperson who worked with Defendants and Plaintiffs at various times; and (3) Defendant Todd Barnhardt. The Court admitted various documents into evidence, including the pertinent contract documents, financial records, and email communications, and took judicial notice of certain filings in Defendants' bankruptcy proceedings.[3] At the close of all evidence, the parties made closing arguments and the Court took the matter under advisement.

## FINDINGS OF FACT

The following findings of fact consist of stipulated facts taken from the parties' joint Final Pretrial Order, (Dkt. 152 at 2-7), and additional facts based on trial testimony and documentary evidence. The findings are also based on the Court's credibility determinations after observing witnesses testify and matters subject to judicial notice. All findings are by a preponderance of the evidence or, when applicable, clear and convincing evidence.

## I.   LMLC's History

1.      LMLC was a childcare center business established in approximately 2009 with a location in Hudson, Wisconsin.

---

[3] *See In re LMLC Franchising, LLC*, No. 19 B 13901 (Bankr. W.D. Wis.); *In re LMLC Management, LLC*, No. 19 B 13900 (Bankr. W.D. Wis.); *In re Barnhardt*, No. 19 B 13897 (Bankr. W.D. Wis.); *Layng v. Barnhardt (In re Barnhardt)*, No. 20 A 53 (No. 19 B 13897) (Bankr. W.D. Wis.); *Aylin & Ramtin, LLC v. Barnhart (In re Barnhardt)*, No. 20 A 25 (No. 19 B 13897) (Bankr. W.D. Wis.).

2. In 2013, LMLC Holdings, Inc. ("LMLC-H") was formed to own other entities that were part of the LMLC business.

3. Barnhardt and his spouse each owned a 28% interest in LMLC-H.

4. Between 2009 and 2015, the business expanded to a handful of additional locations, most of which were at least partially owned by LMLC-H.

5. In approximately 2015, LMLC shifted its business model towards franchising.

6. LMLC-F, an entity wholly owned by LMLC-H, was created to contract with ownership entities created and owned by investors to license LMLC franchises.

7. LMLC-M, an entity wholly owned by LMLC-H, was created to contract with ownership entities to establish and operate LMLC franchises.

8. Barnhardt was the president and CEO of LMLC-H, and the manager of both LMLC-M and LMLC-F.

## II.     LMLC's Foreign Investor Franchise Model

9. An LMLC employee named Nousha Sabet introduced Barnhardt to Kameli and Sharegh, who informed Barnhardt of the opportunity to attract foreign franchise investors through the EB-5 Immigrant Investor Program.

10. The EB-5 Program allows foreign investors to become lawful permanent residents of the United States by investing in commercial enterprises in the United States that meet certain criteria including the full investment of specified amounts and creation of a specified number of jobs.

11. During the relevant time period, the EB-5 Program required foreigners to invest a minimum of $500,000 in businesses in targeted employment areas (TEA) or $1M for businesses in other areas that create at least ten (10) U.S. jobs within a number of years.

4

12. Today, to qualify for a green card through the EB-5 program, foreigners must invest a minimum of $800,000 in businesses in a TEA or $1.15M for businesses in other areas.

13. Foreigners seeking a visa through the EB-5 program first file a petition with the United States Citizenship and Immigration Service (USCIS). In response, USCIS sends a request for evidence (RFE), specifically financial information about the company in which a petitioner has invested.

14. Bermejo, in her role as a paralegal at Kameli Law from 2017-2019, worked with John Kloss, an immigration attorney at the law firm, to prepare multiple EB-5 petitions and gather supporting documents for USCIS consideration.

15. After LMLC-F received government approval to offer franchises for sale, LMLC directly and through employees or agents began marketing LMLC franchises to foreign investors.

16. In 2016, Sharegh started working for LMLC as a foreign sales manager for potential investors.

III. **Plaintiffs' Investment in LMLC Franchises**

17. In early April 2017, Kashi, an Iranian national, became aware of the opportunity and decided to invest in two LMLC franchises in Bloomington, Illinois and Champaign, Illinois.

18. Within weeks, the parties had discussed initial funding and secured approval of anticipated franchise sites; Kashi formed A&R to own the LMLC franchises; and legal documents were drafted and exchanged.

19. Sharegh testified that due to his familiarity with LMLC, he explained various documents relating to the Bloomington and Champaign locations to Kashi, including the Business Plan created by Defendants for A&R, (PX 6), the Franchise Agreements (PX 2, PX 3), and the Management Agreements, (PX 4, PX 5).

5

20.     The documents explained to Kashi included information about fees, the estimated initial investment, anticipated timelines, expenses, financial performance, and other franchise locations, among other things.

21.     At all relevant times, Kashi was located in Iran and spoke Farsi. Both Sharegh and Kameli also spoke Farsi. Barnhardt has never met Kashi. A&R's sole member is Kashi.

**A.     <u>Contract Formation</u>**

22.     On April 26, 2017, the parties executed documents to effectuate the franchise purchase including the Franchise Agreements (PX 2, PX 3), and Management Agreements, (PX 4, PX 5), a Power of Attorney ("POA"), (PX 7), and other related documents. The Franchise and Management Agreements were signed by Barnhardt, as manager of the LMLC entities and by Kashi, as owner of A&R. The POA was signed by Kashi, as sole member of A&R.

23.     For all practical purposes, the Franchise and Management Agreements for the Bloomington and Champaign locations are the same.

24.     The Franchise Agreements provided that A&R agrees to pay, for each location, "an initial license fee of $20,000. The initial license fee, when paid, shall be deemed fully earned and nonrefundable. The initial license fee shall be due and payable at the execution of this Agreement." (PX 2, PX 3).

25.     The Management Agreements provided, in pertinent part, that:

> 1. **<u>MANAGEMENT AND OPERATING RESPONSIBILITY</u>**.
> [A&R] appoints [LMLC-M] as the agent and representative to supervise and direct, for and at the expense of [LMLC-M], the management, operation[,] and maintenance of the Business on the terms and conditions herein provided.
>
> 1.1 **OPERATING AUTHORITY**. [LMLC-M] shall have, full power, authority, discretion and control in all matters relating to the management, operation and maintenance of the Business, including employment policies (b) the receipt, holding and disbursement of

funds; (c) accounting; (d) budget; (e) maintenance of bank accounts; (f) procurement of inventories, supplies and services; (g) advertising, promotion, sales, marketing and publicity; (h) labor policies (including hiring and firing of all employees, (if Franchisee is in process for the EB-5 Immigrant Investor Program and Franchise is created for purposes of EB-5 requirements, Manager shall maintain the minimum number of jobs required for compliance); (i) granting and limiting of credit, and establishment of credit in connection with the operation of the Business (including entering into policies and agreement with credit card organizations); (j) determination of the terms of enrollment for children in the School, including charge, tuition and fees; and (k) entering into such contracts, agreements and other undertakings as [LMLC-M] shall from time to time consider appropriate. [A&R] also entrusts [LMLC-M] with reasonable usage and management of funds placed in the Operating Capital Account provided that nothing in this or any other agreement shall be deemed to grant a right of ownership of the Operating Capital Account or any other entrusted sums in Manager. Manager hereby renounces any claim in ownership of funds in the Operating Capital Account and other profits earned from management of the School, except as set forth in the Franchise Agreement or this Agreement and agrees that the management fee paid as part of the contemporaneous Franchise Agreement shall be adequate and just compensation for its services. [LMLC-M] is at all times bound by the fiduciary duty owed to the [A&R] in management of the School, the Operating Capital Account, and profits earned, and shall not take any action, enumerated or unenumerated, or fail to take any action specifically provided for within this Agreement that shall harm [A&R's] interests in the School or the Operating Capital Account or in profits earned or in Franchisee's immigration proceedings."

***

2. **<u>SERVICES AND DUTIES OF MANAGER</u>**. [LMLC-M] will perform all activities necessary or reasonably required to operate the Business.

***

2.13 [LMLC-M will] Manage the Operating Capital Account such that the account is not depleted, and communicate with [A&R] regarding the balances of the operating account.

7

***

2.21 Any transaction over $5,000, excluding payroll, lease, or amount due to [A&R] or [LMLC-M] under the Franchise agreement and this Agreement, any amount due to a third-party approved by the [A&R] or its designee must be confirmed and approved by [A&R] or its designee. Notwithstanding this paragraph, any transaction over $15,000.00 must be approved by the [A&R] or its designee.

2.22 [LMLC-M] shall take all necessary steps in order to open the School in a timely manner, which shall be no longer than twelve (12) months from the effective date of this Agreement. The opening shall be defined as the time when the doors have opened for children to begin attending the School. If the opening of the School is delayed for more than twelve (12) months, for each month of delay, [LMLC-M] shall credit the [A&R] an amount equal to one month's management fee and shall continue to not charge [A&R] any management fee, until such time that the School has been opened.

***

5.1. Initial Management Fee- This fee is due and payable at the execution of this Management Agreement, [A&R] shall pay [LMLC-M] a management fee of $20,000 . . . ("Initial Management Fee"). This is a onetime fee which pays for school set up and launch as well as management of the first year of operation of School and which shall be non-refundable. This shall be paid according to a Capital Injection Schedule ("CIS") in the form attached hereto. The CIS shall be completed prior to, or at the time, this Agreement is executed.

***

5.6. **OPERATING CAPITAL ACCOUNT**. [LMLC-M] shall maintain an account against which [LMLC-M] can issue checks (the 'Operating Capital Account'). Upon the execution of this Agreement, [A&R] will be required to place a sum of money into the Operating Capital Account. The total sum, to be made in installments according to the CIS which is to be completed prior to, or at the time, this Agreement is executed, in the amount of $230,000 . . . and shall be paid into the Operating Capital Account. These funds are to be used solely for franchise fee and business expenses according [to] the business plan accompanying this Agreement,

8

subject to any future amendments to the business plan. Notwithstanding the forgoing, in any event, [A&R] agrees to maintain a balance in the Operating Capital Account sufficient to cover all the expenses related to the operation of the Business. If [A&R] is a foreign person applying for issuance of a visa through the Secretary of State or for an immigration benefit through USCIS, upon rejection, denial, or revocation of said application, [A&R] may withdraw all of funds from the Operating Capital Account upon Transfer of its interest in Franchise Agreement to an approved third party relationship entity.

\*\*\*

9.1. **RELATIONSHIP OF FRANCHISEE AND MANAGER**. Everything done by [LMLC-M] shall be done as the agent and representative of [A&R], provided it is within the scope of authority granted herein. Neither party shall have the power to bind or obligate the other except as set forth in this Agreement, but [LMLC-M] shall have such additional authority and power as may be reasonably necessary to carry out the spirit and intent of this Agreement."

(PX 4, PX 5).

26.    In addition, the Management Agreements provided that a total of $250,000 was to be paid for each location by May 1, 2018, and required A&R to "maintain a balance in the Operating Capital Account sufficient to cover all expenses related to the operation of the Business." (PX 4, PX 5).

27.    Consistent with the Franchise and Management Agreements, Kashi on behalf of A&R, executed the POA, which granted LMLC-M, LMLC-F, Barnhardt and any other designee authority to establish a bank account for A&R and manage all funds consistent with their agreements. (PX 7).

28.    Specifically, the POA provided that "[Kashi], on behalf of [A&R] ("Company") appoints [LMLC-F], [LMLC-M], Todd A Barnhart, and his delegates ("Agent"), . . . , as agent for

Company to act in any lawful way pursuant to the Management Agreement[s] between Company, and [LMLC-M] with respect to performing the powers listed below." (PX 7).

29.     Barnhardt believes that the POA is void and of no effect because it was not witnessed or notarized as required under Illinois law.

30.     Around April 2017, lease agreements were executed for A&R's two LMLC center locations, in Bloomington and Champaign, Illinois. The leases were executed by A&R as tenant and LMLC-F and Kashi as guarantors. (PX 16 (Bloomington Lease); PX 20 (Champaign Lease)).

**B.      Contract Performance**

31.     After the contract documents were executed in April 2017, Defendants started work to open A&R's LMLC franchises, which consisted of negotiating and executing leases for the Bloomington and Champaign locations, among other things.

32.     Barnhardt, on behalf of LMLC-M, had opened a checking account for A&R at US Bank with an account number ending in 4945 (the "Operating Capital Account"). The account statements reflect the following deposits from Kashi:

| Summary of Kashi Deposits in A&R Operating Capital Account | |
|---|---|
| 04/27/2017 | $100,000.00 |
| 07/05/2017 | $100,075.00 |
| 10/23/2017 | $100,050.00 |
| 12/29/2017 | $129,975.00 |
| Total | $430,100.00 |

(PX 9, PX 38).

33.     On June 11, 2017, A&R, Kashi, and MBM Plus, LLC, a company formed by Sharegh, entered into a services agreement. Sharegh signed the agreement on behalf of MBM as a member. MBM agreed to serve as an independent contractor consultant and advisor to Kashi in connection with his EB-5 petition and investment in the LMLC franchises. Kashi designated MBM to act on his behalf as a previously approved third-party designee approved by LMLC-F and

LMLC-M. MBM agreed to, among other duties, conduct due diligence, review franchise documents, provide translation services, and provide updates from LMLC-M to Kashi. (PX 39).

34.     Essentially, Plaintiffs hired Sharegh (through MBM Plus) to monitor the project and make sure everything was progressing on schedule and in compliance with EB-5 Program requirements. Sharegh stayed in contact with Barnhardt through emails and phone calls, and also went to visit each location, and reported these details to Kashi.

35.     From April through December 2017, Sharegh observed progress on each project, and in January 2018, he visited each site. At that point, Plaintiffs had already sent $430,100 and Barnhardt was requesting the remaining $69,900 in funds. By March 2018, however, Sharegh stated that Barnhardt was not giving him information about A&R's bank accounts and he saw no further progress on the centers.

36.     Barnhardt continued to press Kameli, who was representing Plaintiffs and approximately 10-11 other foreign investors in LMLC franchises, about the need to send outstanding client funding as soon as possible, including the $69,900 from A&R, to avoid the projects being shut down. (*See* DX L (January 18, 2018 email), DX N (April 24, 2018 email); DX O (July 18, 2018 email)).

37.     Starting in May 2017, Defendants had kept Plaintiffs and Sharegh updated on the status of the centers' launch through email communications mostly from Kiernan Scott, the Executive Director of Launch Operations for LMLC-M, sent approximately twice a month. The emails included links to a "launch checklist" (that was not printed and attached to these documents or introduced into the record separately) and available pictures or reports. (*See* PX 29 at 248-307).

38.     Email reports were sent from May 22, 2017 through November 27, 2018. The last report in November 2018 was from Barnhardt to Kashi (which appears to have been translated into

Farsi) and indicated that both buildings were complete, center directors were hired and in training, equipment was being ordered, and all systems and processes were setup and ready to go once the center opened. Even so, Barnhardt noted that there was a work stoppage with respect to finalizing equipment because Kashi had not yet wired the final $69,900. Barnhardt asked Kashi to send the funds immediately. (PX 29 at 305-306).

39.     Defendants never completed applications to obtain the requisite licensure for the Bloomington and Champaign LMLC franchise locations.

40.     Despite the Management Agreements providing that A&R would pay $250,000 per location (for a total of $500,000) by May 2018, (PX 4, PX 5), Sharegh testified that he had advised Kashi not to send any more funds to Defendants because, as of February 2019, they were still looking for further progress and awaiting financial documents. (*See* PX 25). Instead, Plaintiffs deposited the balance due with Kameli, their counsel.

**C.     Kashi's Immigration Petition**

41.     In anticipation of an RFE from USCIS in connection with Kashi's EB-5 petition, Bermejo emailed Barnhardt on November 19, 2018, asking for A&R bank statements, check invoices, payroll information, a complete ledger showing profit/loss and a balance sheet, state and federal income tax returns, agreements with vendors, and building permits, to be provided by December 3, 2018. Barnhardt responded that he was not aware of a pending RFE for Kashi and would provide the documentation upon receipt of the RFE. (PX 23).

42.     On January 8, 2019, Floss emailed Barnhardt and attached the RFE for Kashi. USCIS had already determined that based on Kashi's petition and the initial documents submitted, he had not established his eligibility for the EB-5 Program. However, USCIS gave him until April 4, 2019, to submit the requested additional evidence to support his petition. (PX 28).

43. Barnhardt emailed Floss on March 18, 2019 with a link to the requested business and financial information. (PX 28 at 23; PX 29 at 1-2). The documents sent included, among other items, a general ledger and one-page bank account summary reflecting that as of February 2019, the A&R Operating Capital Account had a balance of $76,276.49 (PX 30 at 3, 9).

44. Floss followed up with another email to Barnhardt on March 21, 2019, stating that they still needed different types of documents for the RFE. (PX 28 at 27-28). In response, Barnhardt sent additional information, including more bank account details and expenses. (PX 28 at 26-27; PX 29). Consistent with the prior bank account summary, Barnhardt included a document that reflected a balance of $77,860.14 as of January 28, 2019. (PX 29 at 394). Floss submitted the RFE to USCIS by the stated deadline. (PX 28).

45. Bermejo testified that sometime around 2019, USCIS denied Kashi's petition. She did not provide a reason for the denial.

### D. A&R's Financial Records

46. Sharegh testified that upon seeing almost $78,000 in the account around February 2019, and the daycares still unopened with no permits procured and no directors hired, he questioned Barnhardt about the need for another $69,900 to purchase equipment. Sharegh stated that Barnhardt stopped communicating with him after that.

47. Once Plaintiffs obtained and reviewed actual bank statements for the A&R Operating Capital Account in 2019, and compared them to the ledgers previously provided by Barnhardt, they noticed significant discrepancies.

48. From April 2017 through April 2019, the general ledger provided by Barnhardt showed an ending balance of $75,036.11, while the bank statements showed an ending balance of negative $34.86. (PX 38).

13

49.     Multiple transactions, including transfers to and from accounts of LMLC-M and LMLC-F, were omitted from the ledgers but appeared in the bank account statements. (PX 38).

50.     Under the Franchise and Management Agreements, a total of $80,000 was due to LMLC-M and LMLC-F.

51.     The business bank statements for April 2017 to April 2019 show that $355,100 was transferred from A&R's Operating Capital Account to LMLC-M and LMLC-F bank accounts. However, the account ledger Defendants prepared for Plaintiffs for the same time period reflect only $80,000 in transfers to those accounts. (PX 38).

52.     Of the $430,100 sent by Kashi, the Court finds that $275,139.10 was used for proper business expenses, including payment of rent of the Champaign and Bloomington locations, associated utilities, business payroll, monthly Quickbook charges, and wire payment fees. Another $2,160 was paid for 56 separate instances of overdraft fees and a few other unexplained bank charges. (PX 9; PX 38; DX T).[4]

53.     The Court finds that a total of $202,171.40 was returned to A&R's Operating Capital Account via transfers from LMLC-M's bank account, LMLC-F's bank account and an unidentified account ending in 4910. (PX 38).

54.     Barnhardt admits that the expenses and revenues on the ledger and bank account statements are inconsistent but maintains that Kameli advised him to reflect only EB-5 expenses and revenues for documents to be submitted to USCIS and that intercompany loans between all the LMLC franchise investors were allowed under the Management Agreements. In addition,

---

[4] At trial, the parties were not precise about these figures. However, both sides stipulated to the admission of the summary charts that each prepared (PX 38; DX T) as an accurate assessment of the A&R Operating Capital Account bank statements (PX 9). In some instances, the summary description was unclear; therefore, the Court reviewed the actual bank statement to determine if a business expense was appropriate. For the most part, all but the overdraft charges were deemed legitimate expenses. There were various account credits (amounting to about $90) that the Court treated as immaterial.

Barnhardt suggested that Kameli authorized intercompany loans at some point in time but conceded that he had no written proof of such authorization.

55.     Barnhardt testified that Sabet was the CFO at LMLC-M but he was the bookkeeper and he tried to create accurate records.

56.     Barnhardt testified that the initial $100,000 deposit in A&R's Operating Capital Account in April 2017 should have been used to pay the $80,000 due up front for franchise and management fees, but the Champaign landlord was due $65,000 pre-paid rent at the same time, so most of the money was used to pay the landlord and most of the fees were deferred. Thus, according to Barnhardt, the project was immediately in the hole by $45,000 because Kashi had not sufficiently funded A&R from the start.

57.     Barnhardt also discussed how, in an email sent from Sabet to Kameli and Sharegh on June 2, 2017, she estimated that another $110,000 would be needed by June 1, 2017, to cover equipment for the Bloomington location and management and franchise fees, and then another $170,000 was required by September 1, 2017, for the Bloomington rent and Champaign equipment. (DX I).

**E.     Plaintiffs' Mitigation Efforts**

58.     On May 5, 2019, Kashi executed a resolution as sole member and manager of A&R revoking the POA for Barnhardt, LMLC-F and LMLC-M, and appointing another company managed by Sharegh as his agent to manage and act on a banking account as A&R's signatory. (PX 35).

59.     On May 29, 2019, Kashi executed a resolution as sole member and owner of A&R removing Barnhardt as manager and registered agent of A&R, appointing himself as manager, and Kameli's law firm as registered agent. (PX 36).

60.     The parties stipulated that over $450,000.00 was transferred by Kashi to A&R subsequent to Defendants being relieved as managers of A&R.

61.     From May 2019 through December 2021, Plaintiffs spent hundreds of thousands of dollars to hire staff, make lease payments, and pursue licensing; however, the business could not be saved.

62.     As of April 2019, the Champaign landlord's ledger reflected a balance due of $116,398.12. The only payments listed were the $10,833 security deposit and $65,000 for six months of rent in May 2017, and $65,000 for the other six months of rent paid in April 2018. (PX 21).

63.     From May 2019 through February 2020, Kameli used the $69,900 remaining from Kashi's $500,000 total investment that was held by his law firm to pay amounts owed by A&R under the Champaign lease. (PX 20).

64.     Sharegh established another checking account for A&R at U.S. Bank ending in 6007 to run the Champaign center from February 2020 through June 2022. (PX 9 at 101-270). Sharegh testified that Kashi invested an additional $370,000 to try to operate the business but it was ultimately unsuccessful.

65.     In March 2022, A&R and Kashi entered into a settlement agreement with the Champaign landlord and agreed to vacate the premises and cancel the lease. (PX 22).

**F.      Legal Actions**

66.     Around April 2019, the Bloomington landlord filed an amended complaint for eviction and breach of contract against A&R under the lease agreement (PX 16), and LMLC-F and Kashi, who had guaranteed the lease payments. (PX 17).

67.     The Bloomington landlord's ledger indicates that the balance due at that point was $75,700.30. (PX 18). In August 2020, A&R and Kashi entered into a payment plan with the Bloomington landlord that resolved their dispute. (PX 19).

68.     The landlord ultimately took possession of the Bloomington property.

69.     On November 20, 2019, all Defendants filed chapter 7 bankruptcy petitions.

70.     The bankruptcy cases of LMLC-F and LMLC-M were closed in July 2020.

71.     Barnhardt agreed to a voluntary waiver of discharge, which was approved by the bankruptcy court in November 2020.

## CONCLUSIONS OF LAW

### I.      Plaintiff's Claims

#### A.      Count I – Breach of Contract (A&R v. LMLC-M)

72.     Under Illinois law,[5] "[t]he essential elements of a breach of contract are: (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) [a] resultant injury to the plaintiff." *Babbitt Mun., Inc. v. Health Care Serv. Corp.*, 2016 IL App (1st) 152662, ¶ 27 (quoting *Batson v. Oak Tree, Ltd.*, 2013 IL App (1st) 123071, ¶ 35).

73.     A plaintiff cannot prevail on a breach of contract claim, however, if the defendant shows that the plaintiff committed the first material breach. *Fermaint v. Planet Home Lending, LLC*, No. 18 C 7325, 2023 WL 5227381, at *23 (N.D. Ill. Aug. 15, 2023). "A breach is material where the covenant breached is one of such importance that the contract would not have been entered into without it." *Wolfram P'ship, Ltd. v. LaSalle Nat. Bank*, 328 Ill. App. 3d 207, 223, 765

---

[5] The parties have not asked the Court to revisit its decision to apply the substantive law of Illinois. (*See* Mem. Op. & Order at 12 n.5).

N.E.2d 1012, 1025 (2001), *as modified on denial of reh'g* (Mar. 20, 2002); *see also Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002) (discussing issues that are focus of materiality inquiry).

74.     A&R claims that LMLC-M breached at least Sections 2.13, 2.21, and 5.6 of the Management Agreements by making unauthorized transfers totaling around $275,100, (see PX 38), from the A&R Operating Capital Account to LMLC-M and LMLC-F. Sections 2.13 of the Management Agreements require LMLC-M to manage the Operating Capital Account such that it is not depleted and communicate with A&R regarding the balance of the account. Section 2.21 required LMLC-M to obtain confirmation and approval from A&R or its designee for any transaction over $5,000, excluding payroll, lease, or amounts to due under the Agreements, and approval for any transaction over $15,000, regardless of the type of transaction. Section 5.6 provides that funds deposited in the Operating Capital Account are to be used solely for franchise fee and business expenses.

75.     LMLC-M responds the transfers were authorized under Sections 1.1 (i) and (k) as "intercompany loans" because those provisions authorized LMLC-M to grant and establish credit in connection with operation of the business and enter into appropriate contracts, agreements, and undertakings.

76.     In addition, LMLC-M contends that, in any event, a total of $201,671.40, *see* PX 38, was returned to A&R's account.

77.     LMLC-M also contends that A&R cannot prevail for breach of contract because A&R breached Section 5.6 of the Management Agreements first by failing to sufficiently fund the project on "day one" and failing to fully fund the projects by May 2018. Section 5.6 requires A&R

to maintain a balance in the Operating Capital Account sufficient to cover all the expenses related to operation of the business and to deposit the required total according to schedule.

78.     During Barnhardt's testimony, he also seemed to suggest that Attorney Kameli authorized him to make intercompany loans but, when pressed, he could not substantiate that assertion.

79.     The Court agrees with A&R that the Management Agreements did not allow LMLC-M to transfer funds from A&R's capital account to LMLC-M's account for use in connection with other LMLC projects or for the benefit of other third-parties. To the extent that Sections 1.1 (authority to establish credit and enter into contracts), 2.21 (requiring approval of certain transactions over $5,000 and all transactions over $15,000), and 5.6 (permitting use of funds for franchise fees and business expenses only) of the Management Agreements conflict with each other or give rise to any ambiguity, the more specific provisions (i.e., 2.21 and 5.6) control. *See Bank of Com. v. Hoffman*, 829 F.3d 542, 548 (7th Cir. 2016) ("where an ambiguity exists in a contract due to a conflict between two of its provisions, the more specific provision relating to the same subject matter controls over the more general provision.") (quoting *Countryman v. Indus. Comm'n*, 292 Ill. App. 3d 738, 742 (2d Dist. 1997).

80.     In any event, the Court rejects LMLC-M's contention that the Management Agreements authorized unrestricted "intercompany loans" and finds there is no credible evidence to show that such loans were otherwise authorized. To read Section 1.1 (i) and (k) to allow intercompany loans without any notice or approval by A&R would conflict with the provisions restricting transaction amounts and use of funds for business expenses only. Defendants offered no credible evidence to support the contention that lending Plaintiffs' capital to prop up franchise

projects of other unrelated investors would be a permissible business expense under the agreements.

81.     The Court also rejects LMLC-M's argument that returning some of the money transferred out of A&R's account somehow cured the breach, as the breach occurred when the funds were transferred and to the extent that those funds were being used for purposes other than A&R's LMLC franchise projects, A&R began to suffer injuries immediately that could not be wholly cured by returning the funds many months later.

82.     Finally, the Court disagrees with LMLC-M that A&R cannot prevail on its breach of contract claim because it committed the first material breach by failing to adequately fund the projects on "day one" or fully funds by May 2018. As noted above, to avoid liability for breach of contract under this theory, LMLC-M must prove that A&R committed the first *material* breach, meaning that the provision breached was so important that LMLC-M would not have entered into the Management Agreements without it. Section 5.6 of the Management Agreements required A&R to "place a sum of money into the Operating Account upon execution of the agreement" and the Capital Injection Schedule simply set forth five payments of $50,000 without specific dates to be deposited by but for the total by May 1, 2018. LMLC-M argues that A&R was essentially immediately in breach by funding on only $100,000 in April 2017 and then another $100,000 in July 2017, when more was needed to pay the franchise and management fees, rent and security deposits, and other expenses. According to LMLC-M, the projects only stayed afloat because they deferred payment of their own fees until more funding came in.

83.     LMLC-M's theory fails for at least two reasons. First, except for the general May 1, 2018 deadline, none of the provisions cited included a specific capital infusion schedule A&R was bound to follow. Second, Defendants have not provided evidence to show that more than

$200,000 was due before it was funded. Thus, LMLC-M has not shown that contributions totaling $200,000 in the first three months of the contract were insufficient to maintain a balance sufficient to cover expenses. Even if the timing of A&R's capital contributions technically breached the Management Agreements, LMLC-M's decision to defer its own fees likely waived any breach. *See Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009) (finding sufficient evidence of waiver where party continued to accept payments under agreement); *Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.*, 719 F.2d 1335, 1343 (7th Cir. 1983) ("A party to the contract may waive a condition precedent to performance on his part or a breach of the contract provisions by conduct manifesting a continued recognition of the contract's existence after learning of the breach thereof, such as 'by continuing to accept performance of the contract and to have the benefit thereof.'") (quoting I.L.P. Contracts § 409 (1955)); *Royal Ornamental Iron, Inc. v. Devon Bank*, 32 Ill. App. 3d 101, 108 (1st Dist. 1975) ("delays in performance may be waived by conduct indicating an intention to regard the contract as still in force and effect.").

84. The bottom line is that it is inconsistent for LMLC-M to claim that A&R breached the Management Agreements on day one by failing to sufficiently fund the projects while at the same time LMLC-M continued to solicit and accept payments from A&R, admittedly used those funds on other LMLC projects unrelated to A&R while claiming to have been using those funds to develop A&R's projects. As discussed above, Illinois law does not recognize such circumstances as a material breach by A&R, and, even if it did, principles of waiver override any such breach. Finally, LMLC-M's argument that A&R breached the agreement first by failing to fully fund by May 1, 2018 fails for two reasons: (1) May 1, 2018 is after LMLC-M began making the unauthorized transfers; and (2) Plaintiffs submitted sufficient evidence to show that the funds

were deposited with their counsel, ready for use pending receipt of financial records from Defendants.

85.    For these reasons, the Court enters judgment in favor of A&R and against LMLC-M on Count I for breach of contract. Damages will be discussed below.

### B.    Count II – Breach of Fiduciary Duty (A&R v. LMLC-M & Barnhardt)

86.    In order to prevail on a breach of fiduciary duty claim under Illinois law, a plaintiff must prove that: (i) a fiduciary duty exists; (ii) the duty was breached; and (iii) such breach proximately caused the plaintiff's injury. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000).

87.    A&R claims that LMLC-M and Barnhardt owed fiduciary duties to A&R in connection with the funds in the A&R capital account by virtue of the Management Agreements, Power of Attorney, and having been entrusted with handing those funds. According to A&R, LMLC-M and Barnhardt breached those duties by making the unauthorized transfers and such breaches proximately caused A&R injuries by diverting A&R's investment for the benefit of others and ultimately resulting in the failure of the Bloomington and Champaign locations.

88.    At trial, LMLC-M admitted that it owed A&R a fiduciary duty under the Management Agreements and essentially conceded that the duty had been breached. Barnhardt, however, insists that he owed no fiduciary duties to A&R because the POA was void due to lack of notarization and witness signature and all his actions were done as a representative of LMLC-M or LMLC-F, not as an individual.

89.    With respect to existence of a fiduciary duty, it is undisputed that LMLC-M owed a fiduciary duty to A&R. Regarding Barnhardt, the Court previously held that: "[T]he power of attorney . . . gives rise to a fiduciary duty owed by Barnhardt individually to A&R with respect to the operating account." (Mem. Op. & Order at 17). In addition, the Court noted that: "[E]ven if the

power of attorney did not expressly provide that Barnhardt owed fiduciary duties to A&R, the fact that he was entrusted with control of hundreds of thousands of dollars in A&R's operating account constitutes special circumstances that likely give rise to a fiduciary duty in connection with handling the funds." (*Id.*)

90.    The existence of a fiduciary duty based on special circumstances must be established by clear and convincing evidence. *Ransom v. A.B. Dick Co.*, 289 Ill. App. 3d 663, 672, (1st Dist. 1997) (citing *State Sec. Ins. Co.,* 258 Ill. App. 3d 588, 595 (1st Dist. 1994)).

91.    Based on the evidence and testimony, the Court concludes that, even if the POA is void because it was not witnessed or notarized,[6] special circumstances give rise to a fiduciary duty owed by Barnhardt individually to A&R. While it is true "the mere fact that business transactions occurred or that a contractual relationship existed is insufficient to warrant finding a fiduciary relationship[,]" *R.J. Mgmt. Co. v. SRLB Dev. Corp.,* 346 Ill. App. 3d 957, 968 (2d Dist. 2004), the amount of trust A&R placed in Barnhardt to have essentially unfettered access to and control of the Operating Capital Account without any supervision allowed Barnhardt to gain superiority and influence over A&R sufficient to give rise to a fiduciary relationship, *see Ransom* 289 Ill. App. 3d at 672; *see also Gonzalzles v. Am. Exp. Credit Corp.*, 315 Ill. App. 3d 199, 210, 733 N.E.2d 345, 354 (1st Dist. 2000) (listing relevant factors in determining whether a fiduciary relationship exists, including "the extent to which the 'servient' party entrusted the handling of its business affairs to the 'dominant party' and placed trust and confidence in it."). Normally, a person entrusted with

---

[6] The Court declines to address this point for several reasons. First, the Court need not reach the issue, as special circumstances give rise to a fiduciary duty. Second, Barnhardt failed to raise the argument that the POA is void for lack of notarization and witness signature at summary judgment and since then has not provided any authority to support the position, except for general references to Illinois law. Finally, even if notarization and a witness signature were required, Barnhardt is likely equitably estopped from arguing that the POA is void because it is undisputed that he acted under authority of the POA by, among other things, opening an account for A&R and transferring funds to and from the account.

using an investor's funds to build a business would be subject to significant financial oversight. Here, Barnhardt was given what amounts to absolute control over the Operating Capital Account without any formal reporting requirements. The Court finds that he took advantage of the trust A&R placed in him by transferring A&R's funds for use on other LMLC franchise projects.

92.     From April 2017 through April 2019, Barnhardt had access to the funds Kashi deposited in A&R's Operating Capital Account, transferred those funds from the account for purposes outside the scope of the parties' agreements (i.e., the "intercompany loans"), failed to seek or obtain approval for the transfers, caused financial ledgers omitting the transfers to be provided to Plaintiffs and their representatives, and otherwise failed to disclose the transfers.

93.     All along the way, A&R was receiving reports from LMLC-M about progress on the projects and the need for more funding for other expenses. During that time period, a total of $430,100 was deposited into the account; $375,100 was transferred out and $202,171.40 was returned. Of those amounts, $80,000 was owed to LMLC-M and LMLC-F as fees and $275,139.10 was used for legitimate business expenses, for a total of $355,139.10. That leaves $74,960.90 in funds that were transferred, not returned, and not accounted for appropriately.

94.     Barnhardt contends that at all times he was acting in his capacity as manager of LMLC-M, which in turn was acting on A&M's behalf under the authority granted by the Management Agreements. Thus, Barnhardt believes that he is insulated from personal liability.

95.     The Court disagrees, however, because Barnhardt's conduct violated his duties as manager by exceeding the authority granted to LMLC-M under the Management Agreements.[7]

---

[7] In the trust context, "[a] trustee is personally liable for any loss occasioned by a violation of his duties as trustee." *Stuart v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 68 Ill. 2d 502, 526 (1977). Although there are certainly differences between duties owed in the contexts of trusts and business transactions, the Court finds the circumstances sufficiently analogous to give rise to personal liability here. In comparison, The Seventh Circuit has

The evidence showed that Barnhardt was acting in his own self-interest by effectuating the unauthorized transfers to keep other LMLC franchise ventures afloat. In doing so, Barnhardt's actions fell fall short of the "duty . . . to exercise utmost care, candor, loyalty and good faith in [his] dealings" that arises from a fiduciary relationship. *Ransom*, 289 Ill. App. 3d at 673, As a result of Barnhardt actions, a significant portion of A&R's investment is lost.

96.     Based on these facts, the Court has no trouble concluding that LMLC-M and Barnhardt both owed fiduciary duties to A&R, breached those duties, and that such breaches caused A&R injury.

97.     For these reasons, the Court enters judgment in favor of A&R and against LMLC-M and Barnhardt on Count II for breach of fiduciary duty. Damages will be addressed below.

## C.     **Counts IV & VI – Fraudulent Misrepresentation (Plaintiffs v. Defendants)**

98.     To prove a claim for fraudulent misrepresentation, a plaintiff must show: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's [justifiable] reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) (quoting *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996); *see also Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452 (1989); *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 193 (1989); *Soules v. Gen. Motors Corp.*, 79 Ill. 2d 282, 286 (1980).

applied a heightened standard to a court-appointed receiver, predicting that Illinois courts would require a showing of willful and deliberate violation of fiduciary duty (or at least gross negligence) before imposing personal liability. *See Alonso v. Weiss*, 932 F.3d 995, 1004 (7th Cir. 2019). The higher burden was warranted there due to concerns about recruiting receivers and trustees for court appointment. That is not the case here.

99.    A plaintiff must prove each element of fraud by clear and convincing evidence. *See Metro. Cap. Bank & Tr. v. Feiner*, 2020 IL App (1st) 190895, ¶ 44 (holding that trial court did not err by applying the clear and convincing standard to each element of fraud claim). "Clear and convincing evidence is considered 'to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense.'" *Metro. Cap.*, 2020 IL App (1st) 190895, ¶ 39 (quoting *Parsons v. Winter*, 142 Ill. App. 3d 354, 359 (1st Dist. 1986)).

100.    According to Plaintiffs, Defendants fraudulently misrepresented the need for and use of funds from the Operating Capital Account during performance of the contract. Specifically, Plaintiffs claim that Defendants' email communications from April 2017 to November 2018 reporting on the progress of the projects and seeking additional funding for various expenses misrepresented the progress and use of funds. In addition, Plaintiffs claim that the financial ledgers provided by Defendants misrepresented the transactions and balances of the Capital Operating Account.

101.    Having carefully considered the evidence and testimony, the Court concludes that Plaintiffs have not carried their burden on these claims.

102.    Although the funds were transferred from A&R's account to use for purposes not allowed under the Agreements, Plaintiffs did not prove by clear and convincing evidence that the statements requesting funding for use on legitimate business expenses were false at the time they were made or that Defendants knew the statements were false.

103.    Furthermore, Plaintiffs have not sufficiently established that their reliance on Defendants' statements were justified. As noted above, parties to a business transaction ordinarily guard their own interests by trusting but verifying that the counterparty is performing as promised under their agreement. While parties are free to conduct themselves as they wish and such

precautions are not generally required, Illinois law does require that reliance on a representation of another be *justifiable* to prove a claim for fraud.

104.    Here, Plaintiffs entrusted several parties they had never met in-person who lived on the opposite side of the world and did not speak their native language with significant sums of their money. Although Plaintiffs, their counsel, and their representative seem to have generally monitored communications from Defendants regarding the progress of the projects and spending of Plaintiffs' funds, there is not sufficient evidence of Plaintiffs' diligence in verifying Defendants' statements along the way. Had Plaintiffs obtained a bank statement for their own account (i.e., the A&R Operating Capital Account) or demanded proof of business expenses being paid as reported in as early as summer 2017, they would have seen that their funds were not being used as reported.

105.    In addition, with respect to the financial ledgers that omitted the unauthorized transfers, the evidence showed that those ledgers were provided after Plaintiffs had deposited their funds, so it is impossible for Plaintiffs to have relied on that information to their detriment.

106.    For these reasons, the Court enters judgment in favor of Defendants and against Plaintiffs on Counts IV and VI for fraudulent misrepresentation.

### D.    <u>Defendants' Affirmative Defenses and Amended Counterclaims</u>

107.    To the extent that Defendants/Counter-Plaintiffs' Affirmative Defenses and Amended Counterclaims have not been resolved or mooted through the above discussion of Plaintiffs' claims, they are fail because Defendants/Counter-Plaintiffs did not assert or otherwise present arguments or evidence in support of them at trial.

108.    Accordingly, judgment is entered for Plaintiffs/Counter-Defendant A&R and against Defendants/Counter-Plaintiffs LMLC-M and LMLC-F on the Amended Counterclaims.

## II.   **Damages**

109.   Having entered judgments in favor of A&R and against LMLC-M of Count I for breach of the Management Agreements and in favor of A&R and against LMLC-M and Barnhardt on Count II for breach of fiduciary duty, the Court must consider the appropriate remedy.

110.   A&R seeks the following relief, as reflected in its Damages Itemization, (Dkt. 154), and as modified at trial during closing argument:

- **Compensatory Damages**: $430,100, plus pre-judgment interest, for the value of services LMLC-M failed to perform/value of funds provided by A&R.

- **Consequential Damages**: $2,084,469, consisting of (A) $1,449,469 for A&R's anticipated net revenue; (B) $80,000 for immigration counsel engagement;[8] and (C) $555,000 for the increased costs of obtaining an EB-5 visa under current investment requirements.

- **Punitive Damages**: $4,273,938, consisting of (A) $2,898,938 for two-times A&R's anticipated net revenue; and (B) $1,375,000 for five-times the amount wrongfully transferred from A&R's Operating Capital Account (around $275,100).

- **Mitigation Damages**: $392,833, consisting of (A) $22,833 for the Bloomington lease settlement agreement and security deposit; and (B) $370,000 for additional funds A&R invested in an attempt to save the child-care business after Defendants' misconduct.

- **Attorneys' Fees**: A&R's counsel also reserved the right to request for such attorneys' fees later on based on this decision.

111.   "The normal remedy for breach of contract is an award of damages." *Miller v. LeSea Broad., Inc.*, 87 F.3d 224, 230 (7th Cir. 1996). Generally, Illinois law permits: direct damages, which consist of the value of benefits that should have received under the contract, less any amount received; special damages, which consists of amounts reasonably foreseeable when the contract was made; and incidental damages, which consists of the amount spent responding to breach. *See* IPI, Contracts, 700.13 (Damages). In calculating damages, a court must determine the

---

[8] A&R admitted during closing arguments that no evidence had been entered in support of immigration counsel attorneys' fees.

amount that will put the plaintiff in as good of a position as it would have been in if all of their promises under the contract had been performed. *Ollivier v. Alden*, 262 Ill. App. 3d 190, 196 (2d Dist. 1994). The party seeking to recover damages has the burden to establish both the correct measurement of damages and the final computation of damages based on that measurement. *Id.* "While damages do not need to be calculated with mathematical precision, basic contract theory requires reasonable certainty and precludes damages based on conjecture or speculation." *Ivey v. Transunion Rental Screening Sols., Inc.*, 2021 IL App (1st) 200894, ¶ 62.

112.    For breach of fiduciary duty, "courts have equitable discretion to fashion the appropriate remedy . . . ." *United States v. Cancer Treatment Centers of Am.*, No. 99 C 8287, 2005 WL 300414, at *1 (N.D. Ill. Feb. 4, 2005) (citing *In re Marriage of Pagano*, 154 Ill. 2d 174 (1992)); *see also Kinzer v. Chicago,* 128 Ill. 2d 437, 445 (1989) ("This court has not accepted the Restatement (Second) of Torts view [recognizing breach of fiduciary duty as a tort] but has regarded breach of fiduciary duty as controlled by the substantive laws of agency, contract ... and equity.").

113.    Even where a fiduciary duty claim arises from the same operative facts as a breach of contract claim or involves injures that are economic in nature, damages may be awarded. *See Seerveld v. Gerstenberg & Co.*, No. 84 C 10385, 1986 WL 2609, at *2 (N.D. Ill. Feb. 21, 1986) (recognizing that damages may be awarded for breach of contract and fiduciary duty claims); *Aaron Transfer & Storage, Inc. v. Bekins Van Lines, Inc.*, No. 02 C 1836, 2002 WL 31509775, at *2 (N.D. Ill. Nov. 12, 2002) (holding that claims for breach of fiduciary duty based on an economic loss are not barred under the *Moorman* doctrine) (citing cases).

114.    Among other things, courts have found that forfeiture may be awarded in certain circumstances for breach of fiduciary duty claims. *See In re Edgewater Med. Ctr.*, 344 B.R. 864,

868 (Bankr. N.D. Ill. 2006) ("Illinois law permits, rather than requires, complete forfeiture of all compensation received by a defendant during the course of the breach of fiduciary duty.") (citing *Dowd & Dowd, Ltd. v. Gleason,* 352 Ill. App. 3d 365 (1st Dist. 2004)).

115.    In addition, punitive damages are available as a matter of law for breach of fiduciary duty claims. *See Gearhart v. Gearhart*, 2020 IL App (1st) 190042, ¶ 152; *Tully v. McLean*, 409 Ill. App. 3d 659, 670 (1st Dist. 2011); *Franz v. Calaco Dev. Corp.*, 352 Ill. App. 3d 1129, 1148 (2d Dist. 2004); *see also Masi v. Ford City Bank and Trust Co.*, 779 F.2d 397 (7th Cir. 1985) (remanding for consideration of punitive damages in connection with fiduciary duty claim). The standard for determining punitive damages has been summarized as follows:

> Punitive damages 'are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future.' " *Slovinski v. Elliot*, 237 Ill. 2d 51, 57-58 (2010) (quoting *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990)). They may be awarded "when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.'" *Slovinski*, 237 Ill. 2d at 58 (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978)). "To determine whether punitive damages are appropriate, 'the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.'" *Slovinski*, 237 Ill. 2d at 58 (quoting Restatement (Second) of Torts § 908(2) (1979)). However, because they are penal in nature, punitive damages are not favored under the law, and courts must take caution to ensure that they are not improperly or unwisely awarded. *Slovinski*, 237 Ill. 2d at 58.

*Gearhart*, 2020 IL App (1st) 190042, ¶ 151 (parallel citations omitted).

116.    Based on these principles, the Court concludes that a total damages award of $114,960.90 is appropriate. This consists of the amount Defendants wrongfully transferred out of

A&R's Operating Capital Account and failed to return of $74,960.90, plus the Management Fees of $40,000.

117.    The Court expressly notes that the damage award excludes (without limitation) the following: pre-judgment interest, because Plaintiffs presented no basis for such relief; franchise fees, because there was no claim for breach of the Franchise Agreements against LMLC-F; immigration counsel fees, because there was no evidence presented in support of such relief; the current increased costs for obtaining an EB-5 visa, because there was no evidence presented to show that this was a term of the Management Agreements or a direct and natural or reasonably foreseeable result of LMLC's breach, let alone an explanation why the petition was ultimately rejected).

118.    In addition, the Court declines to award any punitive damages, because there was insufficient evidence to support such relief. It is undisputed that the unauthorized intercompany loans were made, but there was not sufficient evidence presented to conclude that Defendants acted with wanton or malicious intent, particularly given Barnhardt's claims that he was under the belief, mistaken or not, that Kameli, an attorney and advisor in this venture, told him the loans were permissible. Moreover, given Defendants' financial condition, it is unclear how punitive damages would serve any practical purpose. Indeed, LMLC-M and LMLC-F filed for bankruptcy and are now defunct. Under these circumstances, the Court concludes that an award of punitive damages is not warranted.

## **CONCLUSION**

For all the above reasons, judgment is entered in favor for A&R and against LMLC-M on Count I for breach of contract; judgment is entered in favor of A&R and against LMLC-M and Barnhardt on Count II for breach of fiduciary duty; judgment is entered in favor of LMLC-M and Barnhardt against A&R on Counts IV and VI for fraudulent misrepresentation; and judgment is entered in favor of Plaintiffs/Counter-Defendant A&R and against Defendants/Counter-Plaintiffs LMLC-M and LMLC-F on the Amended Counterclaims.

**DATED**: November 27, 2024                    **ENTERED**:

LaShonda A. Hunt
United States District Judge